HARRY LaRUE McCLELLAND *v.* STATE OF MARYLAND

[No. 259, September Term, 1967.]

*Decided April 22, 1968.*

The cause was argued before ANDERSON, MORTON, ORTH, and THOMPSON, JJ.

*Milton B. Allen* for appellant.

*Alfred J. O'Ferrall, III, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *John H. Lewin, Jr., Assistant State's Attorney for Baltimore City,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

The appellant was found guilty of the crime of riot at a court trial in the Criminal Court of Baltimore and sentenced to imprisonment for a term of 10 years "consecutive with any sentence now serving."

On appeal from this judgment the appellant first presents the question, accepted by the State, "Was the defendant, Harry LaRue McClelland, denied his constitutional right of the effective assistance of counsel guaranteed by Amendment VI of the Federal Constitution?" The question was raised below by three motions filed by the appellant prior to the trial on the merits.[1] A motion to dismiss the indictments was filed on 28 March 1967. It was denied at a hearing thereon on 10 April 1967, without evidence being produced, for the reason that accepting the al-

---

1. The motions were directed also to six other indictments not involved in this appeal.

legations set forth in the motion as true, they would not affect the validity of the indictment. Upon denial of the motion, a motion "for appropriate relief" was filed, setting forth the same allegations contained in the motion to dismiss. Evidence was received with regard to this motion. During the period 19 December to 30 December 1966 the appellant had written eight letters and during the period 19 January to 3 February 1967 at least five letters, each addressed to his counsel and submitted to the prison authorities to be mailed.[2] Several of the letters were returned to him by the prison authorities because they were sealed contrary to prison regulations.[3] On 16 January 1967 the appellant was placed in solitary confinement and he claimed that when he was returned to his cell on 19 January carbon copies of letters he had written to his attorney were missing. Upon his transfer to Patuxent Institution on 3 February three letters that had been returned to him unmailed and carbon copies of certain other letters to his attorney were taken.[4] On 6 April the warden of the penitentiary gave the Assistant State's Attorney of Baltimore City prosecuting the instant case certain documents from the institution's records pertaining to the appellant. Included among those documents were two photocopies and three carbon copies of letters from the appellant to his attorney. Defense counsel's personal secretary testified that she received and recorded all mail to counsel from the appellant and that her records showed that six letters had been received,

2. Counsel was appointed to represent the appellant in the instant case on 1 December 1966. It appears that the appellant had been sentenced to a term of imprisonment of 30 years on prior convictions. He was confined in the Maryland State Penitentiary at the time of the riot and remained there until 3 February 1967 when he was transferred to Patuxent Institution.

3. Prison regulations require that all mail, with a few exceptions not here relevant, be unsealed so they may be censored before being mailed. A classification officer of the Penitentiary, responsible for censoring all of the appellant's mail addressed to his attorney, testified that none of the letters were returned because of content.

4. There was evidence that there was a routine inspection of the appellant's cell on 3 February. Four carbon copies of letters addressed to his attorney and contraband were confiscated.

two of which bore the same date as the two photocopies and two of which bore the same date as the carbon copies in the possession of the State. Prison records showed that defense counsel had private interviews with the appellant at the penitentiary on 19 December 1966 and 19 January 1967.[5] The appellant testified that he knew that his unsealed letters to his attorney would be censored by prison authorities. He stated that he wrote the letters because his atttorney was not able to come to the penitentiary as frequently as he would have liked and that he had too much material to memorize and tell his attorney at a personal interview. An inmate of the penitentiary testified that the assistant warden "threatened" him on 13 July 1966, a few days after the riot, telling him that if he testified at the appellant's trial or told "anybody what has occurred in these cells," he would not be released from the mental observation cell where he was confined.[6] He further said that shortly after 10 February 1967 when he was awarded a new trial on a post conviction hearing both the warden and assistant warden told him that if he testified at the appellant's trial "they would push for a re-trial" on his charges and "if I didn't they wouldn't retry me on those charges." A proffer by the appellant of the testimony of five inmates was accepted by the court. The proffer was to the effect that the inmates were threatened by prison authorities with reprisals if they testified at the appellant's trial. One would also testify that he was told his name had been in a letter written by the appellant and another would testify that he was shown a letter from the appellant to his attorney in which it was stated that the appellant had valuable information and wanted to see the attorney.

5. There is no allegation that counsel was denied the opportunity to consult with the appellant. The warden testified that special arrangements had been made in November 1966 whereby an attorney representing an inmate charged with an offense relating to the riot could, on a notice of one hour, visit with his client in a special visiting area which would be under observation of correctional officers but not within hearing distance of them. Attorneys could so confer with their clients during existing visiting hours or after existing visiting hours. The warden said that no request by the appellant or his attorney to confer had been denied.

6. The appellant was presented and indicted on 22 July 1966.

The lower court denied the motion, whereupon the appellant filed a second motion "for appropriate relief" containing the same allegations as in the prior motion and as an additional ground in support thereof stated that the prosecuting authorities had received copies of letters from the appellant to his attorney. By agreement all the evidence received with regard to the prior motion was accepted as to the second motion and in addition the testimony of the Assistant State's Attorney was received. He testified that he received two photocopies of letters and three carbon copies of letters from the appellant to his attorney from the warden on 6 April 1967. He read the letters for the first time on 8 April and did so because, in his opinion, they would be relevant to the motion to dismiss which alleged that certain letters of the appellants had been censored and seized. He said that no information in the letters was utilized to prepare for the prosecution of the case and that, in fact, there was no information in the letters helpful to the prosecution. The letters, admitted in evidence, did not contain information about the crime for which the appellant was charged, but about irregularities in the conduct of the prison and the treatment of its inmates. The lower court denied the second motion "for appropriate relief."

In disposing of the two motions the lower court, noting that the appellant had been indicted for certain offenses which occurred while he was an inmate in the penitentiary, said that "in an institution of a penal nature, a certain amount of security regulation is basic, that discipline is necessarily strict to insure security and the general welfare of the institution; that censorship of mail is a recognized part of these precautions, and that all of these security regulations, and types of activities are known to the inmates." It found that there was no evidence to show that the appellant was "any exception to this rule," or that he was not in a position to know of the regulations, and to be constrained to conform to them." It found as a fact that arrangements had been made to give an unlimited number of visits by attorneys to their clients and that the visits could be made, not only at the regular visiting hours, but at unusual hours and that privacy would be insured between attorney and client. "So that the basic way of communicating confidential information

from a client to attorney, in an atmosphere where the client knows that the letters are going to be censored, * * * would be by a face to face confrontation and disclosure of information." It further found that no letters from the appellant to his attorney were improperly intercepted, confiscated or destroyed and no showing that the mail handling was improper and that even if it had been improper, there was no showing that it had "any detrimental effect on the communication of information proper and necessary to the defendant's defense." Although there were allegations that since the appellant made statements in his letters that other inmates "were going to testify to certain events or transactions," the censorship of the letters enabled the prison authorities to learn of this and "that they then intimidated these witnesses to the extent that they would not thereafter testify beneficially to the defendant," the lower court found that "the evidence does not disclose that any testimony which McClelland thinks is beneficial to him, and which he thinks would come from these inmates, has been suppressed; or, he has been deprived of it, by virtue of these alleged threats and intimidations." The lower court stated that "a communication between attorney and client lacks the element of confidentiality when it is made under such circumstances that its revelation is to be expected. So that if it is discussed in the presence of a third party, and particularly an adverse third party, then the law will assume that the attorney and the client intended to communicate something confidential in the presence of some party whose interests were adverse to theirs." The court reasoned that both the appellant and his attorney "knew or had very good reason to believe" that what was put into a letter would be "subject to scrutiny of the penitentiary authorities" and therefore was no different than communicating something in the presence of a third person and therefore lacked "the neccessary element of confidentiality." Correspondence between the appellant and his attorney was shown by the evidence to have been one method and "at best an imperfect method" of communicating information, particularly where the attorney and his client were separated only by "some fifteen or twenty city blocks, with an unlimited right of private visitation available." The court found as a fact that the communications by letter between the appellant and his attorney

lacked the element of confidentiality. The lower court further found the photocopying of the appellant's letters was not done for the purpose of supplying the prosecuting authorities with information to be used in the prosecution of the case or in obtaining the indictments which were returned some months before the acts of which the appellant complained. The prosecuting authorities received the copies of the letters only a few days before trial "when presumably all of the prosecution's witnesses had been interviewed and the case was ready for trial, apparently, for some time * * * It certainly would seem to have had little purpose in attempting to intercept these allegedly confidential communications, to transmit to the State's Attorney many months after the case had already reached trial state." We think that the evidence before the court was sufficient to support its factual findings and we find that it did not err in denying the motions. The relief sought by the appellant in all of his motions was included in his prayer for relief in the third motion filed by him. As stated in his brief he requested:

> "(1) A continuance until the taint of unlawful interference with communication between client and attorney has been removed; or
> (2) That the Court find, as a fact, that the confidential relationship between lawyer and client had been so severely impaired as to prevent a fair trial; or
> (3) A dismissal of the indictments."

The lower court found that there was "no sufficient showing to justify the relief prayed." The second and third motions were again offered at the conclusion of all the evidence at the trial on the merits and denied.

The Sixth Amendment to the Constitution of the United States provides, in relevant part:

> "In all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defence."

*Gideon v. Wainwright,* 372 U. S. 335 held that this right was made obligatory on the states through the Fourteenth Amend-

ment and that an accused has a right to counsel at his trial. He is also entitled to the assistance of counsel at other critical stages of the proceedings against him, for example at his appearance in a line-up,[7] during the conduct of a custodial interrogation [8] and on direct appeal from his conviction.[9] When he has the assistance of counsel, that counsel must afford him a genuine and effective representation going to the fundamental fairness of the trial, and if such representation is not afforded him, by reason of his counsel's competency or conduct, his conviction cannot stand.[10] In the instant case the appellant was represented by highly competent counsel, experienced in the defense of criminal cases, and, it is not alleged, nor does the record in any way show, that the representation by counsel himself was other than genuine and effective. But an essential ingredient of the Sixth Amendment's right to counsel is the right of the defendant and his counsel to prepare for trial without intrusion upon their confidential relationship by an agent of the state, the defendant's trial adversary.[11] Such an intrusion may vitiate a conviction and afford the defendant a new trial, not because of the fact of the intrusion but because the effect of it was to deny the defendant a fair trial.[12] Thus the question presented by the appellant

7. *United States v. Wade*, 388 U. S. 218; *Gilbert v. California*, 388 U. S. 263.

8. *Miranda v. Illinois*, 384 U. S. 436.

9. *Douglas v. California*, 372 U. S. 353.

10. *Miller v. State*, 1 Md. App. 653.

11. *Hoffa v. United States*, 385 U. S. 293, 87 S. Ct. 408.

12. In *Hoffa v. United States*, 385 U. S. 293, 308, 87 S. Ct. 408, 416, the Court said, "It is possible to imagine a case in which the prosecution might so pervasively insinuate itself into the councils of the defense as to make a new trial on the same charges impermissible under the Sixth Amendment." In *Caldwell v. United States*, 92 U. S. App. D.C. 355, 205 F. 2d 879, n. 11, the Court said, "Appellant's motion was in the alternative—for acquittal or a new trial. It is the latter claim which is urged on this appeal, and which we sustain. But we think it well to add that the motion for judgment of acquittal appears to us to have been properly denied, in the absence of any showing of prejudice to the defense of such a nature as would necessarily render a subsequent trial unfair to the accused." Whatever such pervasive insinuation and prejudice of such nature may be, we think it clear that neither was present in the instant case.

26

must be related to his trial and the motions made by him are properly considered as of the time they were denied when re-offered at the conclusion of all the evidence at the trial on the merits. We think that the true issue before us is more clearly stated in the following form:

> Did the conduct of the State and its agents render the trial at which the appellant was convicted unfair to him?

We are supported in our conclusion as to the proper posture of the issue before us by other cases involving the right of a defendant and his counsel to prepare for trial without intrusion upon their confidential relationship by the prosecuting authorities or their agents. Both *Caldwell v. United States,* 92 U. S. App. D. C. 355, 205 F. 2d 879 and *Coplon v. United States,* 89 U. S. App. D. C. 103, 191 F. 2d 749 dealt with government intrusion of the grossest kind upon the confidential relationship between the defendant and his counsel. "In *Coplon,* the defendant alleged that government agents deliberately intercepted telephone consultations between the defendant and her lawyer before and during trial." Quote from *Hoffa v. United States, supra,* 385 U. S. at 306-307. In *Caldwell,* the agent, "[i]n his dual capacity as defense assistant and Government agent * * * gained free access to the planning of the defense. * * * Neither his dealings with the defense nor his reports to the prosecution were limited to the proposed unlawful acts of the defense: they covered many matters connected with the impending trial." 92 U. S. App. D.C. at 356, 205 F. 2d at 880. In *Coplon and Caldwell,* the appellate court held that the government's intrusion upon the defendant's relationship with his lawyer "invalidates the trial at which it occurred." 89 U. S. App. D. C. at 114, 191 F. 2d at 759; 92 U. S. App. D. C. at 357, 205 F. 2d 881. In both those cases the court directed a new trial. In *Coplon* the grant of a new trial was conditioned on the defendant's proof of her wire tapping allegations and in *Caldwell* the second trial resulted in a conviction which the Supreme Court declined to review. 95 U. S. App. D. C. 35, 218 F. 2d 370; 349 U. S. 930, 75 S. Ct. 773. We note further that in *Coplon* the allegations of wire tapping were made in support of a motion for a new trial

and in *Caldwell* it was implicit in the holding that the intrusion tainted the conviction. In *Black v. United States,* 385 U. S. 26, 87 S. Ct. 190, the Solicitor General informed the Supreme Court voluntarily, after a petition for certiorari had been denied but before an application for rehearing had been filed, that the F. B. I. in a matter unrelated to the case, had installed a listening device in Black's hotel room and overheard conversations between him and the attorney representing him in the case. Reports and memoranda were subsequently transmitted to attorneys of the Tax Division responsible for the prosecution of the case who found nothing relevant to the case. But "neither the judge, the petitioner nor his counsel knew of the action of the federal agents" nor did the prosecuting attorneys "know at the time of the trial that conversations between Black and his attorney were included in the transcriptions." 385 U. S. at 28, 87 S. Ct. at 191. The Supreme Court said:

> "In view of these facts it appears that justice requires that a new trial be held so as to afford the petitioner an opportunity to protect himself from the use of evidence that might otherwise be inadmissible. * * * This will give the parties an opportunity to present the relevant evidence and permit the trial judge to decide the questions involved. It will also permit the removal of any doubt as to Black's receiving a fair trial with full consideration being given to the new evidence reported to us by the Solicitor General." 385 U. S. at 28-29; 87 S. Ct. at 191-192.

In *Hoffa v. United States,* 387 U. S. 231, 87 S. Ct. 1583, eavesdropping equipment had been installed by trespass in the office of a person not a party to the case. A conversation was overheard between that person and a defendant concerning the conduct of the defense to the prosecution in the case before the Court. The recording was available to government attorneys involved in the prosecution but was only "peripherally relevant to the charges underlying the conviction." The case was remanded for hearing, findings and conclusions on the nature and relevance of recorded conversations to the convictions of all the defendants. In *O'Brien v. United States,* 386 U. S. 345, 87 S. Ct.

1158, a new trial was ordered but it was apparent that the over-hearing of a conversation of the defendant concerning his forth-coming trial by means of an electronic eavesdropping device was not known to the court or the parties at the time of the trial. In *Gradsky v. United States,* 376 F. 2d 993 (5th cir. 1967) after oral argument was heard on remand from the Supreme Court, the defendant filed a motion to vacate the judgment and remand for a new trial on the ground that the F. B. I. had installed a microphone by trespass and overheard his conversations with counsel relating to the charges. The trial had taken place during the period of surveillance. A new trial was granted, but there also it was apparent that the fact of the overhearing of the con-versations was not known at the trial at which the defendant was convicted. In *Cox v. Crouse,* 376 F. 2d 824 (10th cir. 1967) the warden opened, read and communicated to the prosecuting authorities letters of an inmate in the prison to his attorney. The inmate defendant alleged that those facts alone "effectively prevents adequate counselling of a client," and that he need not show prejudice. The court held that it could not infer prejudice from those facts and affirmed the conviction. The Supreme Court denied certiorari. 389 U. S. 865. In *United States v. Taglio-netti,* 274 F. Supp. 220 (D. C. R. I. 1967) the court felt that the Supreme Court had not held that if there had been an in-trusion into any attorney-client conversation a new trial would be mandatory. It held that such conversation in the case before it was unrelated to the criminal case then pending against the defendant and affirmed the conviction.

We conclude that an intrusion into an attorney-defendant re-lationship, even if improper, does not, in itself, bar prosecution. Nor does it vitiate a conviction unless it so taints the trial at which the conviction was obtained as to render that trial unfair to the defendant.

We proceed, therefore, to the consideration of whether the conduct of the State and its agents in the instant case rendered the trial of the appellant unfair to him. In considering this ques-tion we shall assume, without deciding, that the conduct of the State and the prison officials was improper.[13] We have carefully

---

13. There is ample authority that prison censorship of the in-mate's mail is permissible. "Control of the mail to and from in-

reviewed the transcript of the trial and have not the slightest difficulty in concluding that the trial of the appellant was in no way tainted by the conduct of prosecuting authorities and the prison officials of which the appellant complained. We think it significant that before trial, the court, the defense and the State were fully aware of the facts and circumstances relating to the allegations of the intrusion into the relationship of the appellant and his counsel. In disposing of the motions the lower court made clear that it could not tell at that stage of the proceedings whether the intercepted mail had "any real effect on the case or not. That can only be demonstrated during the trial of the case." It observed that it was sure that the appellant's attorney would make proper objections, "if there was any reason to believe that any of the testimony being offered is the result of any improper interception." There was no evidence admitted, or even offered by the State, which was acquired by reason of such conduct, directly or indirectly. It was clear that the defense was not hampered by the challenged conduct. There was no contention that any witness whom the appellant desired to testify in his behalf would not testify because he had been intimidated. In fact a proffer by the appellant that some 22 witnesses would testify that "they were aware, prior to July the 8th, 1967, of various grievances existing among inmates of the Maryland State Penitentiary against the prison administration; that these grievances covered four; vocational training; guard brutality; graft and corruption, engaged in by prison guards, and administration personnel; poor food and favoritism," and "that the purpose of the events or protests of July the 8th was to bring these grievances to the attention of the public," was accepted as part of the record. All testimony and evidence received in the hearing on the motions which the appellant proffered were accepted

---

mates is an essential adjunct of prison administration and the maintenance of order within the prison." *McCloskey v. Maryland,* 337 F. 2d 72 (4th Cir. 1964) at page 74: See also *Green v. Maine,* 113 F. Supp. 253, 256 (D. C. Me. 1953); *Haas v. United States,* 344 F. 2d 56 (8th Cir. 1965). Also, we agree with the lower court as hereinbefore stated, that any confidential nature in the correspondence between the appellant and his counsel was waived by the appellant under the circumstances existent.

at his suggestion as part of the record of the trial. We find no denial of the constitutional rights of the appellant. We hold that the appellant received effective assistance of counsel, that his trial was fair, that he was not entitled to the relief prayed in his motions and that the lower court did not err in denying them.

The appellant also contends that the evidence was not sufficient to sustain the conviction. Not only did some fourteen witnesses produced by the State testify that the appellant participated in acts which were sufficient to prove the offense with which he was charged but the appellant himself admitted when he took the stand that he had set a fire to signal the start of the "protest," that he obtained baseball bats, that he took one himself and made others available to other inmates and that he broke windows and destroyed penitentiary property with other inmates. He said that he had gotten the message the morning of the riot that they were going to "pull a protest." In admitting the activities, he said, "I was joined by a few, and then as momentum, you knew, grew in the thing, and thus as a man, I guess we became a body." We meant to bring the institution, to shut down the institution, to bring all working in the institution, all normal every day functioning in the institution to a complete standstill * * * The purpose of it was to have something spectacular and dynamic that the Baltimore, the Maryland public couldn't fail to see, and therefore investigate and do something about the corrupt conditions that had been there for years. * * * Non-violence means had all been stifled by the administration, effectively stifled." This was his defense to the charges against him. His counsel told the lower court, "It is the defendant's contention that this outburst was an attempt to correct certain grievances of—the prisoners felt they had, and that is the only defense he has offered."

The lower court found that "the evidence clearly stands beyond a reasonable doubt that a riot did occur. And, by the defendant's own admission, that he was not only an integral part of it, but in some sense a leader of it, to what degree of leadership he fell heir, or took upon himself, is not important. But he did participate in the riot, and he was certainly in a position of leadership through the course of events." The allegation of the appellant that the State did not "show any terror on the part of

the populace or inmates of the institution" is of no merit. The evidence was ample to prove the appellant guilty of the crime charged beyond a reasonable doubt and therefore the judgment of the lower court on the evidence was not clearly erroneous. Md. Rules, 1086.

*Judgment affirmed.*