891 A.2d 327

John Ryan SCHLAMP

v.

STATE of Maryland.

No. 24, Sept. Term, 2005.

Court of Appeals of Maryland.

Feb. 3, 2006.

Stacy W. McCormack, Asst. Public Defender (Nancy S. Forster, Public Defender, on brief), for petitioner.

Michelle W. Cole, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for respondent.

Argued before BELL, C.J., RAKER, WILNER, CATHELL, HARRELL, BATTAGLIA and GREENE, JJ.

WILNER, J.

Allegedly in the course of an encounter that lasted not more than 30 seconds, Brandon Malstrom, a 20–year old student at the University of Maryland, was stabbed to death in the early morning hours of November 10, 2002. Believing that petitioner Schlamp was the killer, the State charged him with first and second degree murder, first and second degree assault, and common law riot. A jury in the Circuit Court for Prince George's County acquitted Schlamp of murder and first degree assault but convicted him of second degree assault and riot. For the latter, he was sentenced to ten years in prison; for the assault he was given a consecutive three-year sentence.[1]

The Court of Special Appeals affirmed the judgment. *Schlamp v. State*, 161 Md.App. 280, 868 A.2d 914 (2005). We granted *certiorari* to determine whether the evidence sufficed to establish the common law crime of riot. We shall hold that

---

1. Believing that petitioner's friend, Quan Davis, was also complicit in the stabbing, the State charged him with first and second degree murder, first and second degree assault, riot, and carrying a dangerous weapon openly with intent to injure. Schlamp and Davis were tried together. Davis was acquitted of murder and assault but was convicted of riot and carrying a dangerous weapon. His convictions were affirmed by the Court of Special Appeals in an unreported opinion. This appeal involves only Schlamp.

it did not and shall therefore reverse the judgment of the intermediate appellate court.

## BACKGROUND

The tragic and inexcusable death of Brandon Malstrom arose from what otherwise was a happy occasion for Brandon and his friends. On November 9, 2002, the University of Maryland football team won its Homecoming game against Atlantic Coast Conference rival North Carolina State. That meant it was party time. Brandon spent the day with his brother, Bill. Around 11:30 in the evening, the two of them, along with their friends, Brandon Conheim, Matt Swope, Matt Mitchell, and Paul Speakman, ended up at two parties on Dickerson Avenue, in College Park, a mile or so from the campus. The parties, which had begun around 9:30 that evening, were taking place in adjoining houses and back yards, and seemed to be winding down by the time the group arrived.

Another group, consisting of Schlamp, Quan Davis, Robert Fournier, Jacob Adams, and Kenny Brock, who were neither students at the University nor invited guests, were also at the parties. Schlamp, Adams, and Fournier had spent the afternoon at Fournier's house watching the football game on television and drinking beer. Fournier said that he and Schlamp had consumed between 15 and 20 bottles of beer during the day. Adams stated that he had consumed eight or nine bottles of beer. At some point, they made arrangements to go to College Park that evening to join one or more of the parties. On their way, they stopped at a liquor store to replenish their supply, where they encountered Davis and three of his friends. They informed Davis that they were headed to a party and made arrangements for Davis to join them. The Schlamp and Davis groups joined up in College Park and proceeded first to the home of Fournier's friend, Patrick.[2] Some time around midnight, when they finished partying there, they found their way to the parties on Dicker-

---

2. In the record, Patrick's last name is referred to as Harrell, Carroll, and Curl. It is not clear from the record which name is accurate.

son Avenue. Most of the Schlamp group, including Schlamp, were drunk. Adams testified that, in addition to the beer, Schlamp had begun drinking grain alcohol.

There was evidence that the Schlamp group, and Schlamp in particular, acted in a boorish, obnoxious manner, deliberately instigating verbal confrontations with other people at the Dickerson Avenue parties. Scott Ehrlich, who hosted one of the parties at his home, characterized the scene as "basically just typical college scene that you might see people acting tough, and one person acting tough, another person acting tough, sort of trying to hold their own ground." There was no evidence of any fights, prior to the encounter during which Brandon was stabbed, because the people confronted either backed off or a third person, often Ehrlich, intervened. Matt Swope confirmed Ehrlich's observation, reciting that, although there was a lot of "aggressive talking, and threatening," there was no "attacking, or fights." Bill Malstrom said essentially the same thing—that there were "a lot of verbal confrontations" and that, when someone "got in my brother's face," Ehrlich "diffused the situation." One particular confrontation that was mentioned occurred when Davis, while in Ehrlich's house, allegedly rubbed against a female guest in a way that made her uncomfortable and one or more of the men demanded that he leave.

Most of the 20 to 30 people remaining at the parties seemed to be in the back yards. At one point, Davis showed Adams a knife he was carrying. Adams described it as a "Rambo knife"—big and sharp, with a serrated edge.

Eventually, apparently on the heels of the confrontation with Davis, Ehrlich asked everyone to leave, and, he said, they did. Brandon and his group left the back yard and congregated for a time in the street. While there, Schlamp, with his group in tow, approached Brandon's group, accused them of taking either Schlamp's or Davis's cell phone, and demanded its return or that they empty their pockets for inspection. Brandon responded that no one had the cell phone (and, indeed, no one did), and refused to empty his pockets or turn

over his own cell phone. At that time, Schlamp pushed Brandon—Bill Malstrom referred to it as a real weak swing— whereupon Fournier grabbed Brandon from behind to immobilize him. Bill Malstrom and Conheim attempted to pull Fournier off of Brandon. It was allegedly during that encounter, which everyone agreed lasted less than thirty seconds, that Brandon was stabbed. Although Davis was present, and Brandon Conheim said that he seemed to be "favoring his hip like that, reaching for something," no one saw the stabbing; no one could say who did it. No one was really sure that it occurred during that encounter. As noted, both Schlamp and Davis were acquitted of murder and first degree assault.

While this brief fracas was taking place, a police car turned into the street, Matt Mitchell yelled "police," and most of the people scattered. No one knew at that point that Brandon had been stabbed. Conheim and Mitchell told the officer that Schlamp was the one who started the incident, and Schlamp was taken into custody. With the arrival of the police, some of Brandon's group returned, but no one could find Brandon. Eventually, he was discovered in Ehrlich's back yard, on the ground, mortally wounded. He was taken to the hospital, where, despite four or five hours of rescusitative effort, he died.[3]

## DISCUSSION

The sole issue before us is whether, on this evidence, any rational trier of fact could have found that the State proved the essential elements of the common law crime of riot beyond

---

3. The stab wound severed Brandon's colon, spleen, and aorta, and resulted in massive internal bleeding. Yet, when Brandon was discovered in the back yard, the jacket he had been wearing had been removed and was hanging on the fence. It was unclear how, with such wounds, he had been able to remove his jacket and get to the back yard. The doctor said that he would not have been able to walk very far and did not know whether Brandon would have been able to remove the jacket. He observed that, with such an enormous blood loss, the brain does not function well and one proceeds on instinct. The doctor speculated, "He may have run, pulled something off, something like that. It's unpredictable when you are that shocked."

a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); *Moye v. State,* 369 Md. 2, 12, 796 A.2d 821, 827 (2002); *State v. Albrecht,* 336 Md. 475, 478–79, 649 A.2d 336, 337 (1994). That requires an analysis and description of the crime of riot.

It appears that Maryland is one of only a handful of States that have not codified the crime of riot and that still maintain it as a common law offense. The crime, as it had been defined in England, came to us through Article 5 of the Maryland Declaration of Rights [4] and has been dealt with by this Court on only two occasions, in *Kaefer v. State,* 143 Md. 151, 122 A. 30 (1923) and *Cohen v. State,* 173 Md. 216, 195 A. 532 (1937), *rearg. denied,* 173 Md. 216, 196 A. 819, *cert. denied,* 303 U.S. 660, 58 S.Ct. 764, 82 L.Ed. 1119 (1938). It has been before the Court of Special Appeals on four occasions. *See Briscoe v. State,* 3 Md.App. 462, 240 A.2d 109 (1968), *cert. denied,* 251 Md. 747 (1968); *McLaughlin v. State,* 3 Md.App. 515, 240 A.2d 298 (1968); *McClelland v. State,* 4 Md.App. 18, 240 A.2d 769 (1968), *cert. denied,* 251 Md. 750 (1968), *cert. denied,* 395 U.S. 914, 89 S.Ct. 1759, 23 L.Ed.2d 226 (1969); and *Gibson, Tate & Austin v. State,* 17 Md.App. 246, 300 A.2d 692 (1973).

The crime in England arose, in large measure, from a collection of Parliamentary enactments, some of them quite old.[5] The contours of the offense were shaped to some extent

---

4. Article 5, which has been part of the Maryland Constitution since 1776, provides, in relevant part, that "the Inhabitants of Maryland are entitled to the Common Law of England . . . according to the course of that Law . . ."

5. Four statutes are usually mentioned, although others, at least historically, may have had some relevance. The earliest of the four was that of 2 Edw. III, c. 3 in 1328. That Act prohibited persons, other than the King's servants and ministers in the performance of their official duties, from coming before the King's justices or ministers with force and arms, bringing force "in affray of the peace," or riding armed by day or night in fairs or markets, or in the presence of the King's justices or ministers. Two subsequent statutes dealt more with the problem of mobs destroying property. In 1549, by 3 & 4 Edw. VI, c. 5, Parliament made it a felony for 12 persons or more to destroy any park, pond, conduit, or dovehouse, pull down any houses, barns, or mills, burn any stack of corn, abate the rents of any land or prices of any victual, or

by the Court of Star Chamber, which assumed jurisdiction over those offenses in the Sixteenth and early Seventeenth Centuries. *See* WILLIAM HUDSON, A TREATISE OF THE COURT OF STAR CHAMBER 82–85, as taken from 2 *Collectanea Juridica,* edited by *Francis Hargrave* (1792); 5 HOLDSWORTH: A HISTORY OF ENGLISH LAW 197–98 (1924).

In its early manifestation, the crime of riot was associated with treason, at least where the tumultuous activity threatened the King, a prerogative of the King, or the King's ministers or justices. Indeed, the statute of 3 & 4 Edw. VI. c. 5, mentioned above in note 4, made the riotous assembling of twelve persons or more and not dispersing upon proclamation high treason. *See* 1 EDWARD EAST, A TREATISE OF THE PLEAS OF THE CROWN 73 (1806). In time, riot became one of several offenses against the public peace, the others also having statutory origins. The two with which it seemed to have the greatest affinity were unlawful assembly and rout, although the separate offenses of affray, riding armed with dangerous weapons, tumultuous petitioning, and forcible entry or detainer are also mentioned by Blackstone. *See* 4 Blackstone, *supra* at 146–48; *also* 1 WILLIAM HAWKINS, A TREATISE OF THE PLEAS OF THE CROWN 513–31 (8th ed. 1824).

---

continue together an hour after being commanded by a justice of the peace, sheriff, or bailiff to return. That part of the statute was extended in 1553 by 1 Mar. c. 12, which also prohibited any group of 12 or more, assembled together, from going about, with force and arms, trying to change any law made for religion or any other law of the realm, after being commanded in the Queen's name to return.

The statute of 1 Geo. I, c. 5, enacted in 1714, made it a felony, without benefit of clergy, for 12 or more persons, unlawfully, riotously, and tumultuously assembled together, to disturb the public peace, or to remain so assembled one hour after being ordered by a sheriff, justice of the peace, or bailiff to disperse. *See*, in general 4 REEVES, HISTORY OF THE ENGLISH LAW 487 (1829); 4 WILLIAM BLACKSTONE, LAWS OF ENGLAND 146–48 (1769). The 1714 statute has been commonly referred to as the Riot Act. As Perkins notes, to the extent that it required an official order to disperse, it spawned the slang expression of "reading the riot act." *See* ROLLIN M. PERKINS & RONALD N. BOYCE, CRIMINAL LAW 485 (3rd ed.1982). Over time, a lesser form of the offense was recognized as a misdemeanor where at least three but less than twelve persons were involved.

Unlawful assembly, rout, and riot covered a progression of activity. Citing Coke, 3 *Inst.* 176, Blackstone observes that an *unlawful assembly* occurred "when three or more do assemble themselves together to do an unlawful act, as to pull down enclosures, to destroy a warren or the game therein, and part without doing it or making any motion towards it." 4 Blackstone, *supra* at 146. A *rout* occurred "where three or more meet to do an unlawful act upon a common quarrel, as forcibly breaking down fences upon a right claimed of common or of way, *and make some advances toward it.*" *Id.* (Emphasis added). Blackstone described a *riot* as

"where three or more actually do an unlawful act of violence, either with or without a common cause or quarrel; as, if they beat a man, or hunt and kill game in another's park, chase, warren, or liberty, or do any other unlawful act with force and violence, or even do a lawful act, as removing a nuisance, in a violent and tumultuous manner."

*Id.*

Perkins gives a simple example of how those pyramiding crimes related:

"Assume there are three or more persons with a common design to commit a crime by open force or to carry out some enterprise, lawful or unlawful, in such a violent, turbulent and unauthorized manner as to cause courageous persons to apprehend a breach of the peace. When they come together for this purpose they are guilty of unlawful assembly. When they start on their way to carry out their common design they are guilty of *rout.* In the actual execution of their design they are guilty of *riot.*"

Perkins & Boyce, *supra*, CRIMINAL LAW at 483.

Hawkins also defined the three crimes, saying of riot:

"A *Riot* seems to be a tumultuous disturbance of the peace, by three persons, or more, assembling together of their own authority, with an intent mutually to assist one another, against any who shall oppose them, in the execution of some enterprize of a private nature, and afterwards actually executing the same in a violent and turbulent manner, to the

terror of the people, whether the act intended were itself lawful or unlawful."

1 Hawkins, *supra* at 513.

Although Hawkins and some of the other Seventeenth and Eighteenth Century commentators defined the crime of riot in rather broad terms, it seems at least implicitly clear that the true gravamen of the offense was planned and deliberate violent or tumultuous behavior involving a confederation of three or more persons, for that is what made the entire group, rather than just the actual and direct perpetrators of the violent or tumultuous behavior, guilty of the offense. Hawkins notes, in that regard, that "if a number of persons being met together at a fair, or market, or church-ale, or any other lawful or innocent occasion, happen on a sudden quarrel to fall together by the ears, they are not guilty of riot, but of sudden affray only, of which none are guilty but those who actually engage in it, because the design of their meeting was innocent and lawful, and the subsequent breach of the peace happened unexpectedly without any previous intention concerning it." 1 Hawkins, *supra* at 514. On the other hand, he observes, if, upon a dispute arising, persons otherwise innocently assembled "form themselves into parties, with promises of mutual assistance, and then make an affray, they are guilty of riot, because, upon their confederating together with an intention to break the peace, they may as properly be said to be assembled together for that purpose from the time of such confederacy . . ." *Id.*

That distinction drawn by Hawkins is a critical one. The crime was not regarded as one against either persons or property—the persons injured or property damaged by the unlawful behavior—but rather against the public peace. Along with unlawful assembly and rout, it was regarded as a threat to society "because of the plurality of actors and potential uncontrollability of a mob." CLARK AND MARSHALL, A TREATISE ON THE LAW OF CRIMES, § 9.09 (7th ed.1967). Hawkins makes the point that "in every riot there must be some such circumstances either of actual force and violence, or at least of an apparent tendency thereto, as are naturally apt to

strike a terror into the people; ... for every such offence must be laid to be done *in terrorem populi.*" 1 Hawkins, *supra* at 515.

As noted, most of the American States have codified the crime, and, although the statutes vary in their wording, a common theme in most of them is the confederation of a group of people—the minimum number varies—who engage in tumultuous or violent conduct that creates a public disturbance or a risk of terror or alarm.[6] The judicial decisions vary as well, perhaps as a result of the statutes in force, as to whether the offense requires a showing of actual terror, the commission of an unlawful act, or injury to person or property. *See* Martin J. McMahon, *What Constitutes Sufficiently Violent, Tumultuous, Forceful, Aggressive, or Terrorizing Conduct to Establish Crime of Riot in State Courts,* 38 A.L.R.4th 648 (1985). The six Maryland cases to date have all involved tumultuous and aggressive conduct by a confederation of three or more people, and that is how the crime has been defined in this State.

The two cases decided by this Court, *Kaefer v. State, supra,* 143 Md. 151, 122 A. 30, and *Cohen v. State, supra,* 173 Md. 216, 195 A. 532, both arose out of labor disputes. In *Kaefer,* thirteen defendants were convicted of unlawful assembly, riot, and assault. The issues raised on appeal did not require that the Court expressly define the crime of riot, but, in responding to an attack on the sufficiency of the indictment, we set forth the allegations therein and found them sufficient. The indictment charged, in relevant part, that Kaefer and as many as

---

**6.** *See,* for example, ALA CODE § 13A–11–3; ALASKA STAT. § 11.61.100; ARIZ.REV STAT. § 13–2903; ARK.CODE ANN. § 5–71–201; CAL.PENAL CODE § 404; COLO.REV.STAT ANN. § 18–9–101; CONN. GEN.STAT ANN § 53a–175; D.C.CODE ANN § 22–1322; GA.CODE ANN. § 16–11–30; IDAHO CODE § 18–6401; IND CODE § 35–45–1–2; KAN STAT. ANN § 21–4104; KY REV.STAT ANN. § 525.010; LA.REV STAT. ANN § 329.1; MICH COMP. LAWS ANN. § 752–541; MINN.STAT § 609.71; MONT CODE ANN. § 45–8–103; N.H.REV STAT. ANN. § 644:1; N.Y. PENAL LAW §§ 240.05–240.06; N.D. CENT.CODE § 12.1–25–01; OR.REV STAT. § 166.015; TENN.CODE ANN. § 39–17–301; TEX. PENAL CODE ANN § 42.02; UTAH CODE ANN § 76–9–101; VA.CODE ANN § 18.2–405.

fifty other persons unlawfully, riotously, and tumultuously assembled and gathered together to disturb the peace of the State, while being so assembled, made great noises, tumults, and disturbances, and remained together for about an hour to the great terror and disturbance of nearby persons. *Kaefer, supra,* 143 Md. at 153–55, 122 A. at 31–32. That articulation was found sufficient to charge the crime.

In discussing an evidentiary issue, the Court recounted the evidence presented in support of the indictment—that the defendants were miners on strike, that along with others, they had established a picket line, that they confronted a group of men proceeding to work at the mine, and that, as part of a group of at least 35, the defendants "stopped them and forced them to retire by threats of bodily harm, and by using clubs and throwing stones and by discharging firearms, and that the employees so attacked retreated as best they could." *Id.* at 157, 122 A. at 32–33.

Cohen's convictions for riot and incitement (solicitation) to riot arose from a taxicab strike in Baltimore City that commenced on December 12, 1936 and continued, sporadically, into February, 1937. The counts of the indictment charging riot mirrored, to a large extent, those found sufficient in *Kaefer.* One of those counts alleged that, on December 16, Cohen, along with "divers persons to the Jurors aforesaid unknown," unlawfully, riotously and tumultuously assembled and gathered together to disturb the peace of the City and State, that they made "a great noise, riot, tumult and disturbance," that they remained together for about fifteen minutes "to the great terror and disturbance" of nearby people. The other count added that, while so gathered, they "riotously did assault, intimidate and interfere with divers persons . . . and did destroy certain vehicles." *Cohen v. State, supra,* 173 Md. at 220–21, 195 A. at 534. Cohen demurred to those counts, claiming that they omitted "many of the definitions of riot at common law." *Id.* at 221, 195 A. at 534. One of the alleged defects was that, while the crime requires the participation of at least three people, Cohen was the only one indicted for the offense.

Citing *Kaefer v. State, supra,* and HOCHHEIMER, THE LAW OF CRIMES AND CRIMINAL PROCEDURE, §§ 429–431 (2d ed.1904), this Court found no deficiency. The Court responded first by defining the crime:

"At common law it was necessary that three or more persons be unlawfully assembled to carry out a common purpose in such violent or turbulent manner as to terrify others, and assault or destruction of property may or may not be incident to the execution of the riot. The assembly must be unlawful, else there is no riot, and the unlawful assembly must be charged in the indictment."

*Id.* at 221, 195 A. at 534.

Although noting that in *Kaefer* thirteen persons had been indicted, the Court regarded the sustaining of the sufficiency of the *Kaefer* indictment as precedential. It added that "[o]ne person can be charged with rioting, provided he is alleged to have been so engaged with at least two other persons." *Id.* at 222, 195 A. at 534. In that regard, the Court, quoting a Massachusetts decision and echoing the point made by Clark and Marshall, *supra,* observed that "[i]t is undoubtedly true that a riot cannot ordinarily be committed by one person" because "[i]t is the acting in concert, the unlawful combination, which constitutes the offense." *Cohen v. State, supra,* 173 Md. at 222, 195 A. at 534, quoting *Commonwealth v. Berry,* 71 Mass. (5 Gray) 93 (1855).

The four cases in the Court of Special Appeals arose from two prison riots. *Briscoe v. State, supra,* 3 Md.App. 462, 240 A.2d 109, *McLaughlin v. State, supra,* 3 Md.App. 515, 240 A.2d 298, and *McClelland v. State, supra,* 4 Md.App. 18, 240 A.2d 769, emanated from a widespread disturbance at the Maryland Penitentiary in July, 1966. The disturbance, involving some 200 inmates, began around noon, lasted more than four hours, and resulted in at least $750,000 in damage. The commissary was set afire and looted; fires were started in the industrial shop building, the print and tag shop, and the laundry. While the Fire Department was busy dealing with the fires, the inmates involved were running about hurling

missiles and smashing windows. They attempted to storm the power house but were repulsed. Briscoe was observed engaged in looting, carrying a large piece of lumber, and shouting at the police. McLaughlin was identified as one of the leaders of the disturbance, going from building to building armed with a piece of wood, smashing windows, and encouraging other inmates. The details of McClelland's role are unclear, but he acknowledged that he was an integral part of the riot.

The indictments contained much the same verbiage as those sustained in *Kaefer* and *Cohen*, and, on the precedent of *Cohen*, were declared sufficient. In *Briscoe*, the court held that the indictment did not have to allege any intent on Briscoe's part to assist others, nor did it have to name the others involved in the riot. The Court further held that it was not necessary to prove that any particular persons were placed in fear or terror. Noting that news of the riot was broadcast over the radio and all police officers were directed to report for duty, the Court concluded that "there may be a riot, even though no person or persons are actually terrified, if the violent and turbulent execution of any unlawful act committed by a sufficient number of persons tends to alarm and terrify law-abiding citizens in the peaceful exercise of their constitutional rights and privileges." *Briscoe v. State, supra*, 3 Md.App. at 468–69, 240 A.2d at 112–13. That point was made as well in *McClelland. See McClelland v. State, supra*, 4 Md.App. at 30–31, 240 A.2d at 776–77.

The fourth case, *Gibson, Tate, & Austin v. State, supra*, 17 Md.App. 246, 300 A.2d 692, arose out of a disturbance at the Maryland Correctional Institution. The major issue in the case was the trial court's refusal to remove the case from Washington County, where the prison was located, but Austin contended, in addition, that the evidence was legally insufficient to establish the offense. In rejecting that defense, the Court did not recount all of what had occurred but noted only that forty to fifty inmates had taken control of the recreation room, upsetting tables and erecting barricades. Several cor-

rectional officers had been herded into that room and were threatened by Austin with a club.

 The crime of riot is not confined, of course, to disturbances arising from labor disputes or prison insurrections. The description given in *Cohen* is consistent with the conception of the crime under English law—three or more persons "unlawfully assembled to carry out a common purpose in such violent or turbulent manner as to terrify others." *Cohen v. State, supra,* 173 Md. at 221, 195 A. at 534. Those elements are not established by this record. Although, while at the party, Schlamp and his comrades were, as noted, boorish and obnoxious, they were not unlawfully assembled. Prior to the incident during which Brandon was apparently stabbed, there were no fights, and there was no evidence of other tumultuous behavior that struck terror or was likely to strike terror in anyone. Everyone seemed to agree that the aggression was entirely verbal, apparently one-on-one, and not group-instigated, and was largely diffused or ignored. There was no destruction of property and no evidence of excessive noise. When Mr. Ehrlich had enough and asked the two groups to leave, they did so.

The incident in the street, which lasted less than 30 seconds, was instigated by Schlamp, with the assistance of Fournier. The acquittal of Davis on the charges of murder and assault indicates at least a reasonable doubt by the jury that he was involved in the assault on Brandon. The two groups were in proximity to one another, but there was no evidence of organized group confrontation. It may well have been the fortuitous arrival of the police that averted such a confrontation, but the important point is that one did not occur. Brandon was stabbed, but the State has not shown by whom or even established when. There most likely was at least a manslaughter and possibly a murder, committed by someone, but there was not a riot.

**JUDGMENT OF COURT OF SPECIAL APPEALS REVERSED; CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO REVERSE JUDGMENT OF CON-**