78 A.3d 916

**Brenden DASHIELL**

v.

**STATE of Maryland.**

**No. 485, Sept. Term, 2012.**

Court of Special Appeals of Maryland.

Nov. 4, 2013.

686

Anne K. Olesen (George Washington University Law School, Jacob Burns Community Legal Clinics, on the brief) Washington, DC, for appellant.

Daniel J. Jawor (Douglas F. Gansler, Atty. Gen., on the brief) Baltimore, MD, for appellee.

Panel: KRAUSER, C.J., GRAEFF, BERGER, JJ.

KRAUSER, C.J.

Convicted, by a jury, sitting in the Circuit Court for Montgomery County, of involuntary manslaughter, Brenden Dashiell, appellant, noted this appeal, raising three issues. Reordered to facilitate review, they are:

I. Whether the circuit court erred in instructing the jury that self-defense is not a defense to affray;

II. Whether the circuit court erred in allowing the jury to consider affray as an unlawful underlying act for involuntary manslaughter because the State failed to show that the fight occurred in public or caused terror to the people; and

III. Whether the circuit court erred in refusing to instruct the jury that defense of property may be a defense to assault and affray.

Because the circuit court erred in instructing the jury that self-defense is not a defense to affray, we reverse and remand. We shall, however, briefly address the two remaining issues, as they are likely to arise again if there is a retrial of this case.

## Background

On Saturday, July 2, 2011, Justin Carter and his wife, Evelyn Carter, held a cookout on the back porch of their home in Gaithersburg, Maryland, to kick off the July 4th weekend. Among the guests were Susie Palencia, Mrs. Carter's sister. Ms. Palencia and appellant were, at that time, a couple and together the parents of two daughters. Sometime that evening, appellant called the Carters' home, looking for Ms. Palencia. Upon learning that the Carters were hosting a

cookout and that Ms. Palencia and his daughters were there, appellant drove, on his moped, over to the Carters' home. At some point after appellant arrived, Ms. Palencia left the party, taking their two children with her, but appellant stayed behind.

The witnesses to the tragic occurrence that followed provided accounts of that incident, which, while consistent in some respects, varied as to others, reflecting perhaps the divided loyalties of the witnesses or the significant amounts of alcohol consumed by them at the cookout, a consumption in which both appellant and the victim, Justin Carter, were not reluctant participants.

Undisputed by all accounts, however, is that what began at the cookout as a "playful" wrestling match between appellant and Carter escalated into a fistfight; that, after that fight was broken up, it was revivified when Carter's wife tripped and fell, a fall that Carter attributed to appellant; and that, after that confrontation ended, it re-erupted when Carter, enraged over the refusal of appellant to shake his hand, kicked appellant's parked moped and walked towards him and took the first swing. Several punches later, Carter fell unconscious to the ground and died that night from blows he had received to his head.

The next day, appellant was arrested and was thereafter charged, in a single-count indictment, with involuntary manslaughter. In March 2012, he was tried by a jury in the Montgomery County circuit court and convicted of that offense. After receiving a "flat sentence" of five years' imprisonment, he noted this appeal.

## Discussion

We begin our review of the three issues before us by first defining an "affray." An "affray," a common law offense, has been defined as "the fighting together of two or more persons, either by mutual consent or otherwise, in some public place, to the terror of the people." 2 Joel Prentiss Bishop, *Bishop on*

*Criminal Law* § 1, at 1 (9th ed.1923). *Accord Hickman v. State*, 193 Md.App. 238, 248, 996 A.2d 974 (2010).

The "public place" and "terror to the people" elements of affray are closely related. Indeed, evidence that a fight occurred in a "public place" may be sufficient to establish, ipso facto, that the fight resulted in "terror to the people." But the next question is, whether a fight in a public place, where the only witnesses to the fight are those participating in it, may constitute "terror to the public." *Hickman*, 193 Md.App. at 247–48 n. 7, 996 A.2d 974.

■ To answer that question, we turn to *Briscoe v. State*, 3 Md.App. 462, 240 A.2d 109 (1968). Though not precisely on point, *Briscoe* provides a compelling analogy. In that case, the crime at issue was not "affray" but the common law offense of "riot," which, in *Briscoe*, occurred on the grounds of a Maryland prison. As an affray, the crime of riot requires that the conduct in question poses a terror to others. Specifically, that offense is defined as "three or more persons 'unlawfully assembled to carry out a common purpose in such violent or turbulent manner as to terrify others.'" *Schlamp v. State*, 390 Md. 724, 737, 891 A.2d 327 (2006) (quoting *Cohen v. State*, 173 Md. 216, 221, 195 A. 532 (1937)).

Pointing out that the State had "offered no direct evidence to show that any of the witnesses, inmates of the penitentiary, or residents of the City of Baltimore were placed in fear or terror as a result of the riot," Briscoe claimed that the evidence did not support his conviction for that offense. We rejected that claim, observing that "there may be a riot, even though no person or persons are actually terrified, if the violent and turbulent execution of any unlawful act committed by a sufficient number of persons tends to alarm and terrify law-abiding citizens." *Id.* at 468–69, 240 A.2d 109. In *Schlamp v. State*, 390 Md. 724, 891 A.2d 327 (2006), the Court of Appeals cited *Briscoe* with approval, asserting that "it was not necessary to prove that any particular persons were placed in fear or terror," and reversed Schlamp's conviction for "riot" because "there was no evidence of other tumultuous

behavior that struck terror or was likely to strike terror in anyone." *Id.* at 736–37, 891 A.2d 327.

■ We reach the same conclusion as to an affray, as there is no rational basis for drawing a distinction between "riot" and "affray," for purposes of establishing "terror to the people," a point a leading treatise makes when it states that, to establish the "terror" element of affray, "[t]error need not actually exist among the people"; rather, "[i]n a legal sense, fighting in public is to the terror of the people." Lewis Hochheimer, *The Law of Crimes and Criminal Procedure*, ch. 36, § 243, at 281 (2d ed.1904) (citing *State v. Sumner*, 36 S.C.L. (5 Strob.) 53 (S.C.Ct.App.1850)). Hence, to establish an affray, the State need only show that the acts and surrounding circumstances were "likely to strike terror in anyone," *Schlamp*, 390 Md. at 737, 891 A.2d 327, not that it actually has in any specific individual. We turn next to appellant's three claims of error.

## I.

Appellant's first claim is that the circuit court erred in instructing the jury that self-defense is not a defense to affray. Although the State acknowledges that self-defense is generally a defense to affray, it insists that appellant, in his opening statement, "conceded" that the fighting which took place was mutual, thereby negating self-defense; and that, in any event, the evidence showed that he invited Carter to step off the patio to fight. In other words, the facts of this case were, according to the State, "inconsistent" with self-defense and, hence, the circuit court arrived at the correct result (though for the wrong reason) and therefore committed no reversible error.

■ To begin with, self-defense, in our view, may be invoked as a defense to affray. An affray, by its very definition, involves "fighting." And as we said in *Bryant v. State*, 83 Md.App. 237, 574 A.2d 29 (1990), where we contemplated whether self-defense could be used as a defense to maiming, a form of aggravated assault, "the simple and frequently ne-

glected larger truth is that the defense of self-defense applies to assaultive crimes generally." *Id.* at 245, 574 A.2d 29. Consistent with that line of reasoning, the Court of Appeals subsequently, in *Jones v. State*, 357 Md. 408, 745 A.2d 396 (2000), concluded that self-defense is also a defense to reckless endangerment, reasoning that "the elements of self-defense necessarily negate a required element of reckless endangerment," to wit, "that a reasonable person would not have engaged in the conduct at issue." *Id.* at 430, 745 A.2d 396. That same reasoning applies to an affray, where fighting is an essential element of the offense.

But we may be merely stating what was, at one time, commonly understood.[1] *See Hamlin v. State*, 67 Md. 333, 338, 10 A. 214 (1887) (observing that "where two persons are indicted for an affray; if the breach of the peace has been proved, the effort of each traverser would be to show that he was acting in self-defence against the attack of the other") (Bryan, J., dissenting).[2]

Moreover, the appellate courts of other states have reached the same conclusion. In *Coyle v. State*, 72 S.W. 847 (Tex. Crim.App.1903), a case that presents the very same issue now before us, that is, whether a defendant charged with both assault and affray was entitled to a self-defense jury instruction as to both charges, the Court of Criminal Appeals of Texas considered whether a trial court erred in refusing to

---

1. We cannot merely rely on *Hamlin v. State*, 67 Md. 333, 10 A. 214 (1887), and say that it settled the question. The Court, in *Hamlin*, never even considered affray, and the language we are quoting comes from a dissent, where it was expressed in a hypothetical. In the many decades since *Hamlin*, there are essentially no Maryland appellate decisions addressing the elements of affray, until *Hickman*, in 2010, and that decision does not address whether self-defense is a defense to affray.

2. The question before the Court in *Hamlin* was how many peremptory strikes may be exercised when defendants are tried jointly, under statutes then in effect, Art. 50, §§ 9 and 13. Although Judge Bryan dissented from the majority's interpretation of the relevant statutes, his remarks about affray appear to reflect the common understanding of the law of affray at that time.

instruct a jury that self-defense is a defense to affray. In that case, "there was a quarrel between the parties" and conflicting evidence as to whether Coyle or his opponent "occasioned the quarrel." *Id.* at 848. Coyle was subsequently charged with two counts: aggravated assault and affray. At the conclusion of his trial, the court "gave a charge on self-defense as applicable to the first count on aggravated assault, but failed to give a charge on self-defense as applicable to the second count on affray, although a charge was requested by [Coyle] on this subject," whereupon Coyle was convicted of affray but acquitted of aggravated assault. *Id.* at 847. Reversing his conviction for affray, the Texas appellate court observed that, under the circumstances, "it should have been left for the jury, under appropriate instructions, to say whether or not [Coyle] acted in self-defense." *Id.* at 848.

The Supreme Court of Georgia said much the same thing in *Hawkins v. State*, 13 Ga. 322 (1853), when it stated:

> [W]here the evidence shows that one of the parties acted entirely in self-defence, while the other assaulted and beat him, the aggressor may be guilty of an assault and battery, but neither of them guilty of an affray[.]

*Id.* at 324.

More recently, appellate courts in Massachusetts and Alaska have embraced this precept. *Commonwealth v. Nee*, 83 Mass.App.Ct. 441, 985 N.E.2d 118, 126 n. 8 (2013) (noting that "[n]othing in the definition of affray precludes a defendant so charged from asserting self-defense or defense of another in justification of his conduct"); *Dawson v. State*, 264 P.3d 851, 854 (Alaska Ct.App.2011) (observing that if "one person unlawfully attacked another, and the other person used force in an effort to defend himself, the instigator was guilty of assault and battery, while the other participant was entirely innocent of crime," that is, "there was no affray"). *Accord* Charles E. Torcia, 4 *Wharton's Criminal Law*, § 536 at 194 (15th ed.1996); 2A *Corpus Juris Secundum, Affray*, § 15 (2003).

Although the State admits that the circuit court gave the wrong reason for its ruling, it nonetheless contends that the

court did not err in instructing that self-defense is not a defense to an affray under the circumstances of this case. The instruction was appropriate, the State insists, because appellant "specifically conceded" that the fighting was mutual and because the evidence confirmed that mutuality.

There is little basis for the State's assertion that appellant "conceded" that the fight was mutual. Indeed, the only support for its claim, as the State admits, is an assertion made by appellant's counsel, during opening statement, that "[b]oth men entered that fight willingly" and that they both "pushed and punched and fought until one of them went down and didn't get up." An opening statement, of course, is not evidence, *see* Maryland Criminal Pattern Jury Instructions 3:00 (2d ed.2012) (observing that "[o]pening statements and closing arguments of lawyers are not evidence") ("MPJI–Cr"), and is often used as a vehicle to present a number of possible defenses and even conflicting factual accounts.

Nor did the trial court find that the evidence presented was "inconsistent" with self-defense. In fact, the court, during a bench conference that occurred just before the jury was instructed, declared that self-defense was "generated" by the evidence. Then, upon the urging of the State to limit application of self-defense to just second-degree assault, the court, over appellant's objection, did so, instructing the jury that, "in the context of this case, self defense is a defense only to the assault and not to an affray."

■ Before this Court, the State now seems to suggest that self-defense was not generated by the facts of this case, citing the "mutuality" of the affray, which, it maintains, was "inconsistent with self-defense." [3] To place this claim in perspective,

---

3. "A trial court must give a requested jury instruction where (1) the instruction is a correct statement of law; (2) the instruction is applicable to the facts of the case; and (3) the content of the instruction was not fairly covered elsewhere in instructions actually given." *Carroll v. State*, 428 Md. 679, 689, 53 A.3d 1159 (2012) (citations and quotations omitted). The first requirement was met, as we have just explained, and, in light of the court's instruction that self-defense applies only to assault and not affray, there is no contention, by the State, that the

we shall address what degree of mutuality is required to prove an affray.

 There are two ways a fight may be deemed "mutual" for purposes of affray. To be found guilty, a person "must be unlawfully fighting, either by agreement, or have brought on the fight himself." Justin Miller, *Criminal Law*, ch. 18, § 168, at 490 (West 1934); *see also* Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* 479–80 (3d ed.1982). But whether "mutuality" means that there was an agreement to fight or that the accused provoked the fight, mutuality remains a question of fact and thus falls within the province of the fact finder. *Atkins v. State*, 421 Md. 434, 443, 26 A.3d 979 (2011). In other words, where a defendant has been charged with affray, the question whether he engaged in mutual fighting or, instead, merely acted in self-defense, is for the fact finder to determine and not for the court to decide as a matter of law. That being so, we agree with appellant's assertion that "the State's argument would effectively permit the judge, rather than the jury, to find that [Carter and appellant] engaged in mutual combat." We therefore conclude that, where a defendant is charged with affray, it is incumbent upon the trial court, upon request, to instruct the jury regarding self-defense, whenever that issue is generated by the evidence.

 We turn next to the question whether self-defense, specifically perfect self-defense, was generated by the evidence presented below.[4] The elements of perfect self-defense are:

---

content of appellant's requested instruction was fairly covered elsewhere in the instructions actually given. We thus focus on whether self-defense was generated by the evidence.

4. Imperfect self-defense is inapplicable to the instant case, because appellant was charged only with involuntary manslaughter, not murder. Imperfect self-defense "operates to negate malice, an element the State must prove to establish murder," and thus, "the successful invocation of this doctrine does not completely exonerate the defendant, but mitigates murder to voluntary manslaughter." *State v. Faulkner*, 301 Md. 482, 486, 483 A.2d 759 (1984).

(1) The accused must have had reasonable grounds to believe himself in apparent imminent or immediate danger of death or serious bodily harm from his assailant or potential assailant;

(2) The accused must have in fact believed himself in this danger;

(3) The accused claiming the right of self-defense must not have been the aggressor or provoked the conflict; and

(4) The force used must not have been unreasonable and excessive, that is, the force must not have been more force than the exigency demanded.

*State v. Faulkner*, 301 Md. 482, 485–86, 483 A.2d 759 (1984).

■■ To be entitled to a jury instruction as to either perfect or imperfect self-defense, "the defendant has the burden of initially producing some evidence on the issue ... sufficient to give rise to a jury issue." [5] *Dykes v. State*, 319 Md. 206, 216, 571 A.2d 1251 (1990) (internal citations and quotations omitted). The "source of the evidence is immaterial; it may emanate solely from the defendant," *id.* at 217, 571 A.2d 1251; or from a State's witness. *Howell v. State*, 56 Md.App. 675, 682–83, 468 A.2d 688 (1983). Moreover, it "is of no matter that the self-defense claim is overwhelmed by evidence to the contrary. If there is any evidence relied on by the defendant which, if believed, would support his claim that he acted in self-defense, the defendant has met his burden." *Dykes*, 319 Md. at 217, 571 A.2d 1251.

Recently, the Court of Appeals reaffirmed this "any evidence" standard in *Wilson v. State*, 422 Md. 533, 30 A.3d 955 (2011). There, it held that the defendant was entitled to an imperfect self-defense jury instruction to the crime of first-degree murder, even though his claim of self-defense was " 'overwhelmed by evidence to the contrary,' " 422 Md. at 542–

---

5. Of course, once the issue is generated, the burden shifts to the State to prove, beyond a reasonable doubt, that the defendant did not act in self-defense. *Dykes v. State*, 319 Md. 206, 216, 571 A.2d 1251 (1990).

43, 30 A.3d 955 (quoting *Dykes,* 319 Md. at 217, 571 A.2d 1251), and reversed. *Id.* at 544, 30 A.3d 955.

■ In the case at bar, there was evidence, when viewed in the light most favorable to appellant, *State v. Martin,* 329 Md. 351, 354, 619 A.2d 992 (1993), that suggested that there were three separate confrontations at the Carters' cookout, a situation not unlike the one before us in *Corbin v. State,* 94 Md.App. 21, 614 A.2d 1329 (1992), where we considered whether a murder defendant's proposed self-defense jury instruction should have been given. In that case, we said that an inference could be drawn, based solely on the defendant's testimony, that there were two separate confrontations, only minutes or even seconds apart, "rather than one 'continuing affray.' " *Id.* at 27, 614 A.2d 1329.

In the instant case, Jeremy Vasquez, a guest at the Carters' cookout, testified that, at the beginning of the fight, "[i]t just looked they," referring to Carter and appellant, "were like rough housing." While they were "wrestling" on the ground, Justin Carter was, according to Vasquez, "on top" of appellant. At some point, testified Vasquez, Carter "grabbed" appellant's arm and then, according to another guest, "bent it back," causing appellant to emit "a screech sound, like it hurt" or, as appellant put it, it "felt like something tore in my arm." After appellant then "got up" and told Carter "to get the F. off of" him, the two men separated, though not without exchanging angry words. But, pertinent to our analysis, their physical engagement, at least for the moment, had ended. Carter then walked over to a chair and sat down, while appellant remained standing.

After the "wrestling" had concluded, a verbal altercation ensued between Carter and appellant. Malicki Bangoura, another guest at the cookout, avowed that Justin Carter was the "first" to get angry, "talking to [appellant] all types of ways." Carter was "yelling," testified Bangoura, but appellant was not. In fact, appellant, as described by Bangoura, "was calm like," suggesting he was "just going to leave," just "hop on [his] moped and leave."

According to Vasquez, the parties' verbal exchange lasted "probably, like two minutes, maybe less than that," when Justin Carter's wife, Evelyn, stepped "in the middle of the argument" between Carter and appellant and, in her words, "tripped on this little step" and fell. Carter, apparently believing that appellant had intentionally caused her fall, declared that "nobody knocks my girl over" and then, in Bangoura's words, "hopped out of his chair in an aggressive manner," ran towards appellant and "gave him a firm angry push," whereupon both men started throwing punches at each other. Appellant struck Carter several times in the head, causing him to "drop[ ]." But, according to Bangoura, he "got right back up," whereupon Evelyn Carter pushed appellant out of the way and, in appellant's word, "separated" the two men. She was, by then, as Vasquez put it, "basically screaming, telling everybody to leave."

Shortly thereafter, Carter, according to Vasquez, offered to shake appellant's hand. When appellant declined that offer, Carter, according to Bangoura, "got more aggressive." He "ran up to [appellant's] moped" and kicked it over, exclaiming that "if you're going to (unintelligible) my prize possession, I'm going to (unintelligible) prize possession." Looking at appellant, Carter "took a couple steps" towards him and, according to appellant, swung at him and missed. Appellant responded by punching Carter "a couple" of times and knocking him down. Then, "grabb[ing] his moped" and pushing it up the street, appellant left the scene, accompanied by Bangoura.

Appellant thus presented "some evidence" of all four elements of perfect self-defense. The testimony, which we have just outlined, when "[c]onsidered in the light most favorable to" appellant, *Martin*, 329 Md. at 354, 619 A.2d 992, could, if believed, have led the jury to conclude that appellant was not the aggressor and did not provoke any of the three confrontations but, most importantly, did not precipitate the last and final encounter. Furthermore, the jury could have found that he had reasonable grounds to believe that he faced imminent or immediate threat of serious bodily harm from Justin Car-

ter; that he actually did so believe; and that, in striking Carter "two [or] three times," he did not use excessive force in defending himself.

██ In short, there was sufficient evidence to generate a self-defense instruction, and thus the trial court erred in refusing to instruct the jury that self-defense is a defense to affray. And that error, we cannot say, was harmless, since, under the circumstances, there is no way to know whether the jury convicted appellant only on the ground that affray was the underlying unlawful act supporting his manslaughter conviction or that the jury found, instead, an absence of self-defense and that second-degree assault was also an underlying unlawful act, or both.

## II.

██ Appellant claims that the circuit court erred in instructing the jury that it could convict him of involuntary manslaughter, based upon affray, because the State failed to present sufficient evidence either that the fight occurred at a public place or that it caused "terror to the people." Pointing out that the fight began on the back porch of the Carters' home, that it thereafter was confined to their yard, and that there was no evidence that the Carters' barbecue was open to the general public, appellant insists that the fight occurred in the "curtilage" of a private dwelling, and therefore did not take place at a "public place" or in "public" and that there were no public bystanders to be terrified.

Although appellant failed to object to this instruction and thus the issue was not preserved for appellate review, we shall nonetheless exercise our discretion and address it, given the likelihood that this issue will arise again upon retrial. Md. Rule 8–131(a).

Our discussion of that issue begins with the observation that appellant misconstrues the nature of "public place," as that term has been interpreted by courts as an element of an affray. He cites no authority, nor has our research disclosed any, suggesting that the concept of "curtilage" is relevant or

applicable to the question of what is a "public place" in affray cases. Indeed, the overwhelming weight of authority suggests that, if fighting occurs on private land that is sufficiently near a public road or neighboring dwellings, then the "public place" element of affray is satisfied. *In re May*, 357 N.C. 423, 584 S.E.2d 271, 274 (2003) (observing that "private property that is situated near enough to public thoroughfares that citizens using such thoroughfares could bear witness to the altercation" is deemed "public" for "purposes of proving an affray"); *Carwile v. State*, 35 Ala. 392, 393 (1860) (holding that "a place within an enclosed lot, ninety feet from a street" in a town, "and which could be seen from the street, is a public place, according to the import of the phrase in the common-law definition of an affray"); Perkins & Boyce, *supra*, at 480 (observing that " 'public place' in this sense includes any place open to public view and close enough to the public so that fighting there may tend to cause public alarm").

Moreover, the case upon which appellant relies for the contrary proposition, *Gamble v. State*, 113 Ga. 701, 39 S.E. 301 (1901), is, when subjected to scrutiny, not inconsistent with the cases we have just cited. In *Gamble*, the Supreme Court of Georgia held that a private house, "about 200 yards from any other residence" and " 'near' a public road," was not a public place for purposes of affray. But it reached that conclusion based, in part, on the total lack of evidence establishing either the distance from the house to the road or whether the fighting "could be seen or heard from the road." *Id.* at 302. In so ruling, the *Gamble* Court, in fact, acknowledged the general rule that a public road is "prima facie" a public place and "may give that character to places in sight and hearing from the road," citing, among other authorities, *Carwile v. State, supra. Gamble*, 39 S.E. at 302. We therefore conclude that *Gamble* merely stands for the unremarkable proposition that there must be some evidence that a public road is, in fact, near enough to a private dwelling to extend its public character to that private dwelling, an evidentiary showing which, though absent in *Gamble*, was, as we shall explain, satisfied here.

It is undisputed that the altercation between appellant and Justin Carter began in a private area. But the third and final confrontation took place on the Carters' lawn, within a few feet of a street. Furthermore, the aerial photograph of the Carters' home and its surroundings that was introduced at trial plainly shows that there were several neighboring homes within, at most, a 300–foot radius of the Carters' home. Moreover, the Carters' home abuts a public street in a heavily populated, suburban neighborhood, as reflected in the photograph introduced at trial.

Given that it was only necessary that there be "some evidence" that the fight occurred in a "public place," the trial court did not err in instructing the jury that affray could be considered an underlying unlawful act for purposes of establishing manslaughter.

### III.

■■■ Appellant asserts that the circuit court erred in refusing to instruct the jury that defense of property is a defense to assault and affray. He claims that such an instruction was generated by the evidence, because all witnesses to the fight testified that he and Carter "resumed fighting immediately after" Carter kicked his moped and that he "indicated" that Carter's act "directly caused them to fight." This contention is without merit.

■■■ A person may "use reasonable force, not intended or likely to cause death or serious bodily harm, to prevent or terminate another's intrusion upon" his "lands or chattels," if

"(a) the intrusion is not privileged or the other intentionally or negligently causes the actor to believe that it is not privileged, and

(b) the actor reasonably believes that the intrusion can be prevented or terminated only by the force used, and

(c) the actor has first requested the other to desist, and the other has disregarded the request, or the actor reasonably believes that a request will be useless, or that substantial harm will be done before it can be made."

702

*Vancherie v. Siperly,* 243 Md. 366, 371, 221 A.2d 356 (1966) (quoting *Restatement (Second) of Torts* § 77 (1965)).

Even construing the testimony in the light most favorable to appellant, it is clear that the third confrontation between him and Justin Carter was not a result of an effort by appellant to protect his moped. Appellant never testified that that was what precipitated their final confrontation. In fact, when asked why he struck Carter "at that point," appellant replied: "Because he swung," not because appellant was trying to protect his property. And, in any event, the testimony suggested that, after kicking appellant's moped, Carter had turned and walked away from it. In other words, Carter's "intrusion upon" appellant's "chattel" had ended by the time the fight between Carter and appellant resumed. Thus, the trial court did not err in refusing to instruct the jury as to defense of property, as that issue was not generated by the evidence.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED. CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY MONTGOMERY COUNTY.**