REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1602

September Term, 2014

_____

GEORGE DORAN NOTTINGHAM

v.

STATE OF MARYLAND
_____

\*Zarnoch,
 Leahy,
 Sharer, J. Frederick
         (Retired, Specially Assigned),

JJ.
_____

Opinion by, Sharer, J.
_____

Filed: April 27, 2016

\* Zarnoch, Robert A., J., participated in the conference of this case while an active member of this Court; he participated in the adoption of this opinion as a retired, specially assigned member of this Court.

In January 2013, at the conclusion of a night of drinking at an Ocean City tavern, appellant, George Doran Nottingham, got into a fight with his friend, Michael Post. That fight concluded when Nottingham "sucker punched" Post, causing Post to fall and suffer fatal head injuries. An indictment was returned in the Circuit Court for Worcester County, charging Nottingham with assault in the second degree and involuntary manslaughter for his role in Post's death.

A jury trial ensued, in August 2013, but ended in a mistrial. Trial was re-scheduled for December of that year. Shortly before the scheduled retrial, the State entered a *nolle prosequi* to the original indictment and thereafter obtained a new indictment, charging Nottingham with involuntary manslaughter, assault in the second degree, reckless endangerment, intoxication, and affray. Following a second jury trial, Nottingham was convicted of all charges except intoxication.[1]

The circuit court imposed a sentence of seven years' imprisonment for involuntary manslaughter and concurrent five-year sentences for each of the other convictions. Nottingham thereafter noted this appeal, raising the following questions, which we have re-cast:

> I. Whether the circuit court erred in instructing the jury on the crime of affray; and
>
> II. Whether Nottingham's right to a speedy trial was violated, where the State delayed his retrial by postponing his case and opportunistically re-charging him.

---

[1]Different judges presided at the first trial, including the speedy trial motions hearing, and the second trial.

We hold that the circuit court erred in omitting an element of the crime of affray from its jury instruction and that the error, under the circumstances of this case, was not harmless, as to the affray charge. Because, however, that error had no effect on the verdicts for second-degree assault and reckless endangerment, either of which was a valid predicate offense underlying the manslaughter conviction, we affirm the remaining convictions. We further hold that Nottingham's right to a speedy trial was not violated.

Accordingly, we shall vacate his conviction for affray, affirm all other judgments of conviction, and remand for further proceedings.

## FACTUAL BACKGROUND

Most of the facts in this case are not in dispute, as there were surveillance cameras in and outside of the bar where the crimes occurred, and film footage obtained from those cameras was admitted into evidence at Nottingham's trial. Where there may be any differing inferences to be drawn from those facts, we present them in a light most favorable to the State. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

During the evening of January 25, 2013, Nottingham, Post, and a third friend, Robert Jackson, were drinking together in the Harbor Inn, a bar in Ocean City. Shortly before closing time, in the early morning of January 26, what had been, in the words of the bartender, Herbert "Buddy" Groff, "kidding around and playing" turned into a fight when Post and Jackson took Nottingham's cell phone and hid it from him. According to one witness, William Wilkens, Nottingham then began to look "all over" for his phone,

"throwing bar stools" and hurling obscenities. He eventually discovered that Post had the phone and demanded to know why Post had not so informed him. Then, in Wilkens's words, "stupidity ensue[d]."

Nottingham "pushed" or "bumped" Post in the chest. Post, in turn, "got aggravated" and pushed Nottingham back. Nottingham also punched Post several times, including at least once in the face, and also pushed Wilkens in the "[c]hest or throat" area. Groff then intervened, telling Nottingham to "just stop it." As it was approximately 1:40 a.m. (twenty minutes before closing), Groff, after separating the men, asked "Mike Post to go out the front door," asked "Robert Jackson to go out the back door," and allowed Nottingham to remain, "because he had the tab" for all three men that evening. As Post left, he, in the words of Wilkens, "flipp[ed] off" Nottingham.

Nottingham "paid his tab" and remained in the bar for a few minutes, when he approached the front of the bar, near the front door. Groff moved to block Nottingham from leaving, standing between him and the bar and suggesting that Nottingham leave through the back door instead. Nottingham told Groff that he "just want[ed] to go home," and Groff, seeing no one outside, relented and allowed Nottingham to leave.

Unbeknownst to Groff, Post was still outside. Upon seeing Post, Nottingham punched him once in the face, knocking him to the ground and causing him to land on his head. According to the pathologist from the Office of the Chief Medical Examiner who performed the autopsy on Post, the cause of death was the head injury he sustained from that fall.

−3−

Shortly afterward, Nottingham went back inside the bar and told the people inside that Post had "slipped" and fallen. Nottingham, Jackson, and Wilkens went outside and tried unsuccessfully to revive Post. Groff called an ambulance, but Post was pronounced dead at 2:20 a.m.

After the first jury trial resulted in a mistrial, a new trial was scheduled for October 10, 2013, but the State moved for a continuance, a request which was granted over defense objection.[2] A new trial date of December 10, 2013, was set. Shortly before that date, the State entered a *nolle prosequi* to the original indictment and thereafter, on December 17, 2013, obtained a new indictment, charging Nottingham with involuntary manslaughter, assault in the second degree, reckless endangerment, intoxication, and affray.

Nottingham moved to dismiss, on the ground that his right to a speedy trial had been violated. After a hearing, on February 14, 2014, the circuit court denied that motion. The case was ultimately retried, before a jury, on June 16, 2014, and Nottingham was convicted of involuntary manslaughter, assault in the second degree, reckless endangerment, and affray.[3]

Additional facts will be noted as pertinent to discussion of the issues.

---

[2]The request for continuance was made by the State based on "trial conflicts." At the motions hearing, the motions court observed that Nottingham's assertions of prejudice as a result of the delay were "speculative" and, at least implicitly, determined good cause and denied the motion to dismiss.

[3]The circuit court granted a motion for judgment of acquittal as to the intoxication count.

# DISCUSSION

## I. The affray instruction

The court instructed the jury on the offense of affray as follows:

> The Defendant remains charged with the crime of affray. In order to convict the Defendant of affray, the State must prove that the Defendant willfully engaged in a fight with [the victim] in a public place.

Nottingham contends that the trial court erred in overruling his objection to the jury instruction given for affray. He raises two distinct claims of instructional error: first, that there was insufficient evidence of either mutual combat or terror to the public and that, therefore, the instruction given was not generated by the evidence; and second, that the circuit court, in adopting the State's proposed affray jury instruction, omitted an element of the crime of affray from the instruction—namely, that to convict a defendant of an affray, the State must prove that the fighting was "to the terror of the people."

We begin with the question whether the instruction given was a correct statement of the law and conclude that it was not. We next consider and reject Nottingham's claim that no affray instruction was appropriate in light of the evidence (or lack thereof). Finally, we address the effect of the instructional error on the verdicts.

## A. Affray

Affray is "the fighting together of two or more persons, either by mutual consent or otherwise, in some public place, to the terror of the people." *Dashiell v. State*, 214 Md. App. 684, 689 (2013) (citation and quotation omitted). Although affray shares common elements

with common law assault and battery, it is, unlike assault and battery, not a crime against the person; rather, affray is "a crime against the public and its aim is to protect the peace." *Hickman v. State*, 193 Md. App. 238, 252 (2010).

*Hickman* involved facts not dissimilar to those before us in this appeal, i.e., a barroom fight escalating into the death of one of the participants. Writing for the Court, Judge Arrie Davis, observed that the case was "one of first impression, namely, whether the common law crime of an affray exists in Maryland[.]" *Hickman*, 193 Md. App. at 247. Discussing the crimes of assault and battery, *vis a vis*, the then-recent legislative re-codification of those common law offenses into statutory offenses, the Court held that affray remains as a viable, chargeable common law offense in Maryland.

In so holding, the Court pointed out that "[u]nlike other states, which have codified the common law offense of affray, Maryland has not and, therefore, if the offense exists, it is clearly only as a matter of common law." *Id.* at 248. The Court further observed that "Maryland case law does demonstrate that common law affray has, historically, been a chargeable common law offense." *Id.* at 249.

Because the offense remains viable in Maryland, the "public place" and "terror to the people" elements remain likewise viable. "The 'public place' and 'terror to the people' elements of affray are closely related," and "evidence that a fight occurred in a 'public place' may be sufficient to establish, ipso facto, that the fight resulted in 'terror to the people.'" *Dashiell*, 214 Md. App. at 690. To prove the "terror to the people" element, the State "need

only show that the acts and surrounding circumstances were 'likely to strike terror in anyone,'" not that they "actually" have "in any specific individual." *Id.* at 691 (quoting *Schlamp v. State*, 390 Md. 724, 737 (2006)).

In *Dashiell*, we sought to clarify the relationship between the "public place" and "terror to the people" elements of affray, relying on Lewis Hochheimer's treatise, in which he stated that, as to affray, "[t]error need not actually exist among the people"; rather, "[i]n a legal sense, fighting in public is to the terror of the people." *Dashiell*, 214 Md. App. at 691 (quoting Lewis Hochheimer, *The Law of Crimes and Criminal Procedure*, ch. 36, § 243, at 281 (2d ed. 1904)).[4] It appears that this comment was interpreted by the State, in requesting the instruction, and by the trial court, in giving the instruction, so as to obviate altogether the "terror to the people" element of affray.

Nonetheless, "public place" and "terror to the people" are distinct elements of the crime of affray, both of which, like any element of a charged offense, must be proven by the State, beyond a reasonable doubt. Indeed, the early common law commentators appear to have been in substantial agreement that affray consists not only of fighting in a public place, but that such fighting must be "to the terror of his majesty's subjects." 4 Sir William

---

[4]Hochheimer, in turn, cited *State v. Sumner*, 36 S.C.L. (5 Strob.) 53 (S.C. Ct. App. 1850), in support. In that case, the court addressed, among other things, whether the State was required to prove "that the people were terrified." *Id.* at 56. *Sumner* held that "[t]he existence of terror among the people, as a matter of fact, does not require proof." *Id.* The court further explained that, although affray "must be charged to have been in a public place," if "proved accordingly, . . . it is presumed" that "the inference of law will be strong enough to import whatever of terror may be a necessary ingredient." *Id.*

–7–

Blackstone, *Commentaries on the Laws of England* 144 (New ed. 1825); *accord* 3 Joseph Chitty, *A practical treatise on the criminal law: comprising the practice, pleadings, and evidence, which occur in the course of criminal prosecutions* 821 n.(x) (3d Am. ed. 1836) ("An affray is a public offence to the terror of the king's subjects. . . . Every assault does not include an affray, as where the assault does not terrify the people in general, it being committed in private[.]"); 1 William Hawkins, *Pleas of the Crown* 487 (8th ed. 1824) ("It is said, that the word 'affray' is derived from the French word *effraier*, to terrify, and that, in a legal sense, it is taken for a public offence to the terror of the people.").

Subsequent cases establish that, to prove an affray, the State must, at minimum, show that the fighting and surrounding circumstances were likely to result in terror to the public.[5] Two decisions are instructive in that regard: *State v. Heflin*, 27 Tenn. 84 (1845), and *Carwile v. State*, 35 Ala. 392 (1860).

In *Heflin*, the Supreme Court of Tennessee addressed the sufficiency of an indictment charging an affray, which failed to expressly allege that the fight occurred in a public place. The indictment in that case stated that

> Bartlett Travis and William Heflin, late of the county of Montgomery, laborers, on the twenty-second day of February, one thousand eight hundred and forty-six, with force and arms, in the county aforesaid, an affray did make by then and there fighting together in the town of Clarksville, greatly to the terror of the good people[.]

---

[5]To the extent that *State v. Sumner*, *supra*, 36 S.C.L. (5 Strob.) 53, holds otherwise, we decline to follow it.

*Id.* at 84-85.

In holding that the indictment was insufficient, the Court observed

> that there may be an assault which will not amount to an affray, as where it happens in a private place out of the hearing or seeing of any except the parties concerned, in which case it cannot be to the terror of the people.

*Id.* at 85-86 (quoting 1 Hawkins, *supra*, at 487). Not only did the Tennessee Supreme Court hold that to "constitute an affray, a necessary and indispensable ingredient is that the fighting must be in some public place," *id.* at 85, it further held that the omission of the "public place" element necessarily meant that the indictment did not sufficiently allege that the fighting "be to the terror of the people," despite the fact that the indictment itself contained similar "terror" language. We conclude that, considering *Heflin*, an indictment charging affray must expressly state both that the fighting occurred in a public place and that it tended to cause terror to the people.

In *Carwile v. State*, *supra*, 35 Ala. 392, the Supreme Court of Alabama addressed whether "a place within an enclosed lot, ninety feet from a street" in a town, and "which could be seen from the street, is a public place, according to the import of the phrase in the common-law definition of an affray." *Id.* at 393. In concluding that it was, the Court noted that the "distinguishing characteristic of an affray is the terror to the people actually resulting, or presumed to result, from the fighting in a public place," and that, under the circumstances before it, "[t]error to the people" could be "presumed from the fighting in a public place." *Id.* at 394. Although *Carwile* held that terror could be presumed from the fact that fighting

–9–

occurred in a public place, it did not countenance omission of the "terror to the people" element from a jury instruction, nor is it plausible that it could have, given its characterization of that element as the "distinguishing characteristic of an affray."

As we made clear in *Hickman*,

> An affray is an aggravated disturbance of the public peace and is an offence exclusively against the public. An affray is, therefore, characterized as a public disturbance, a crime against the public and its aim is to protect the peace. . . . As stated by the renowned authority on the English common law, Sir Matthew Hale, "An assault is but a wrong to the party, but an affray is a wrong to the Commonwealth."

193 Md. App. at 252-53 (internal citations, quotations, and footnote omitted).

In the instant case, the trial court omitted any mention of the "terror to the people" element from its instruction to the jury as to the crime of affray. In so doing, the trial court erred.

## B. The instruction

The State submitted a requested instruction to the trial court, based, the prosecutor asserted, on the language of *Dashiell*. The court ultimately instructed the jury, based on the State's request, that

> [t]he Defendant remains charged with the crime of affray. In order to convict the Defendant of affray, the State must prove that the Defendant willfully engaged in a fight with [the victim] in a public place.

Defense counsel objected, not to the particular language of the instruction, but to the giving of the affray instruction at all, arguing that the evidence did not support the instruction.

In the discussion of the State's proposed instruction, the following, turning on the

import of *Dashiell*, was said:

> [PROSECUTOR]: . . . Dashiell[] deals squarely with the issue. The issue before the Court was whether or not the State needed to prove that it was to the terror of the public, which is what common law -- the language of common law.
>
> The Court, in Dashiell, stated that it need not be to the terror of the public, that ipso facto, if it happens in a public place, a fight is terror to the public. That is the square holding of Dashiell.
>
> THE COURT: Wait a minute now. But it says in a public place to the terror of the people.
>
> [PROSECUTOR]: That is the common law language, but Dashiell deal[t] with that issue. Because the issue before the Court in Dashiell was whether or not the State needed to prove that there were people in terror, because they had not.
>
> The Court of Special Appeals said that they need not show that there was any terror to the public, that ipso facto, if there is a fight in a public space, it is considered terror to the public, it need not be part of the elements the state need prove. And that is the square holding of Dashiell.
>
> * * *
>
> THE COURT: It's a question, what is meant by, to the terror of the people? I think what [Defense Counsel] is saying, that phrase to the terror of the people means there must be a public disturbance that must affect the people.
>
> But I understand reading the case, it was an or conjunction, either in a public place or to the terror of the people. It means, if you've got one or the other of them, you've got the instruction, so I read the case. So, I will accept your instruction on affray.

As we have concluded, the instruction, by omitting the "to the terror of the people" element, was erroneous. The State's reliance on *Dashiell* in its urging of the instruction given was misplaced. Dashiell was charged, not with affray, but with involuntary manslaughter. Our discussion concluded that Dashiell was entitled to an instruction that self-defense was a defense to affray, to the extent that affray was an underlying element of the involuntary manslaughter charge.

Thus, we reaffirm that affray is a viable common law offense in Maryland and that, when charged, and if the evidence justifies, a defendant is entitled to an instruction that contains both inherent elements of the crime—"in a public place" and "to the terror of the people."

## C. Sufficiency of the evidence as to affray

We next address Nottingham's claim that there was insufficient evidence of either mutual combat or terror to the people and that, consequently, no affray instruction was appropriate in this case.[6]

---

[6]The State misconstrues Nottingham's appellate claim as, in part, a challenge to the sufficiency of the evidence. In fact, Nottingham does not directly challenge the sufficiency of the evidence; indeed, his brief does not even mention Maryland Rule 4-324, the rule which governs motions for judgment of acquittal, the vehicle for raising such a challenge. Only because a challenge to a jury instruction on the ground that it was not generated by the evidence inevitably injects the question of evidentiary sufficiency into the case is the latter question before us. *See Dishman v. State*, 352 Md. 279, 292 (1998) (observing that, in considering whether a requested jury instruction was generated by the evidence, a reviewing court must determine whether the proponent of the instruction "produced that minimum threshold of evidence necessary to establish a *prima facie* case that would allow a jury to
(continued...)

Claims of instructional error are governed by Maryland Rule 4-325, which provides in part:

> **(c) How Given.** The court may, and at the request of any party shall, instruct the jury as to the applicable law and the extent to which the instructions are binding. The court may give its instructions orally or, with the consent of the parties, in writing instead of orally. The court need not grant a requested instruction if the matter is fairly covered by instructions actually given.
>
> * * *
>
> **(e) Objection.** No party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly after the court instructs the jury, stating distinctly the matter to which the party objects and the grounds of the objection. Upon request of any party, the court shall receive objections out of the hearing of the jury. An appellate court, on its own initiative or on the suggestion of a party, may however take cognizance of any plain error in the instructions, material to the rights of the defendant, despite a failure to object.

---

[6](...continued)
rationally conclude that the evidence supports the application of the legal theory desired").

Given that the remedy for an instructional error is typically reversal and the opportunity for a new trial, *see*, *e.g.*, *State v. Hawkins*, 326 Md. 270, 290-91 (1992), whereas the remedy for evidentiary insufficiency is outright acquittal, *see*, *e.g.*, *Evans v. Michigan*, 568 U.S. __, __, 133 S. Ct. 1069, 1073 (2013), we would face a dilemma if Nottingham's instructional claim had merit, because the possibility would arise of reversing a conviction and ordering a retrial, despite having found that the evidence was insufficient to warrant a State-requested jury instruction and, therefore, surely insufficient to sustain the conviction. Because, as we explain, the affray instruction was generated by the evidence, we need not confront that dilemma.

Rule 4-325(c) requires that a trial court give a requested jury instruction "where '(1) the instruction is a correct statement of law; (2) the instruction is applicable to the facts of the case; and (3) the content of the instruction was not fairly covered elsewhere in instructions actually given.'" *Cost v. State*, 417 Md. 360, 368-69 (2010) (quoting *Dickey v. State*, 404 Md. 187, 197-98 (2008)). Only the second condition, whether the instruction was "applicable to the facts of the case," is at issue here. But before we can address Nottingham's claim, we must first determine, as the State suggests, which parts of that claim are preserved and which are not.

Nottingham made a timely objection to the circuit court's affray jury instruction. He contended, *inter alia*, that, although it was clear that he had assaulted the victim in a public place, there was "absolutely no public surrounding it, no evidence of any individuals around." In response to the State's incorrect assertion that, under *Dashiell*, it was unnecessary to prove terror to the public, Nottingham countered that, in *Dashiell*, unlike in the present case, "there were other people present." Then, following the trial court's instruction, Nottingham repeated his objection, agreeing with the court's characterization of that objection—that "it has to be a public disorder or some[] . . . other person put in fear[.]"

At no time did Nottingham object to the challenged jury instruction on the ground that there was insufficient evidence of mutual combat. That issue is therefore not preserved. Md. Rule 4-325(e). As to that issue, reversal would be appropriate only if the alleged error were "plain." *Id.* Given the evidence that Nottingham assaulted Post at least three times; that Post

-14-

"pushed" Nottingham at least once during the fight; and that, upon being ejected from the tavern, Post "flipped . . . off" Nottingham as he was leaving, it is clear that there was no plain error (or indeed, any error at all) as to whether there was sufficient evidence of mutual fighting to warrant an affray jury instruction.

On the other hand, Nottingham's claim that there was insufficient evidence of terror to the public to warrant an affray jury instruction is preserved. That claim, however, is without merit. Given the evidence that, inside the bar and in the presence of the bartender and other patrons, Nottingham threw several bar stools and punched Post at least once, and that there was mutual pushing and shoving, it is clear that there was sufficient evidence "that the acts and surrounding circumstances were likely to strike terror in anyone" observing the fight. *Dashiell*, *supra*, 214 Md. App. at 691 (citation and quotation omitted). We therefore conclude that an affray jury instruction was generated by the evidence.

## D. The effect of the instructional error on the verdicts

Having concluded that the circuit court erred in omitting, in its jury instruction, any mention whatsoever of the "terror to the people" element of the crime of affray, but that it was appropriate to instruct the jury as to affray, under the evidence presented in this case, we turn next to consider the effect of the error on the verdicts. The leading case addressing the applicability of harmless error analysis to such an instructional error is *Neder v. United*

-15-

*States*, 527 U.S. 1, 8-15 (1999), which held that the omission of an element of an offense from a jury instruction is amenable to *Chapman* harmless error analysis.[7]

In applying harmless error analysis in *Neder*, the Supreme Court framed the question before it as "whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element." *Id.* at 19. If, in answering that question, "a reviewing court concludes beyond a reasonable doubt that the omitted element was uncontested and supported by overwhelming evidence, such that the jury verdict would have been the same absent the error, the erroneous instruction is properly found to be harmless." *Id.* at 17.

The State was required to show that Nottingham engaged in affray, that is, "the fighting together of two or more persons, either by mutual consent or otherwise, in some public place, to the terror of the people." *Dashiell*, *supra*, 214 Md. App. at 689 (citation and quotation omitted). The element omitted from the instruction, that the fighting was "to the terror of the people," was contested below. Moreover, the part of the fighting when the fatal

---

[7]In federal criminal trials, there are two standards of harmless error, depending upon whether the error at issue is "constitutional." Claims of non-constitutional error in federal criminal cases are governed by the standard articulated in *Kotteakos v. United States*, 328 U.S. 750, 776 (1946), under which an error requires reversal only if it "had substantial and injurious effect or influence in determining the jury's verdict." Claims of constitutional error in federal criminal trials, in contrast, are governed by the more stringent standard articulated in *Chapman v. California*, 386 U.S. 18, 24 (1967), under which an error requires reversal unless a reviewing court is "able to declare a belief that it was harmless beyond a reasonable doubt." The latter standard applies to all errors, whether or not of constitutional dimension, in Maryland criminal trials. *Dorsey v. State*, 276 Md. 638, 657-59 (1976). Thus, *Neder* applied the *Dorsey* harmless error standard.

blow was struck occurred outside, in the winter, at an early morning hour.[8] Although we do not hesitate to say that, given that a portion of the fighting occurred inside the tavern, in the presence of others, there was sufficient evidence to establish "that the acts and surrounding circumstances were likely to strike terror in anyone," *id.* at 691, we cannot say that this evidence was "overwhelming," *Neder*, 527 U.S. at 17, or that no rational jury could have concluded otherwise. *Id.* at 19. We therefore conclude that the error was not harmless, and we vacate Nottingham's conviction for affray.

"Under the law of this State, where there is a conviction for only one offense and an erroneous instruction on that offense, the judgment is ordinarily vacated and the case remanded for a new trial." *State v. Hawkins*, 326 Md. 270, 290 (1992) (citation omitted). "However, where there are multiple offenses involved, as is the case here, the remedy for an error in the instructions on one of the offenses depends upon the degree to which the erroneous instruction taints each individual conviction." *Id.* at 291.

As "terror to the people" is not an element of either assault in the second degree or reckless endangerment, it is clear that the erroneous affray instruction "despoiled only" the affray verdict, leaving the other two verdicts "chaste and pure," and "there is no good cause to wash out the judgment entered on" the convictions for assault in the second degree and reckless endangerment. *Id.* Moreover, as the jury was properly instructed that it could

---

[8]Indeed, it was fortuitous that the act was captured on a surveillance video camera, as there were no other witnesses at the time the fatal blow was struck.

convict Nottingham of involuntary manslaughter if it found him guilty of **any** of three predicate offenses—affray, assault in the second degree, or reckless endangerment—and it is clear from the verdicts that the jury found him guilty of **both** assault in the second degree and reckless endangerment, we hold that the conviction for involuntary manslaughter also is untainted by the error.

## II.  Speedy trial

Nottingham contends that, in "opportunistically" postponing his case by entering a *nolle prosequi* to the original indictment and thereafter obtaining a new indictment, the State caused his right to a speedy trial to be violated and that, therefore, the charges against him should have been dismissed.  This contention is without merit.

The right to a speedy trial is guaranteed under the Sixth Amendment, made applicable to the states by the Fourteenth Amendment, as well as Article 21 of the Maryland Declaration of Rights.  *State v. Kanneh*, 403 Md. 678, 687 (2008).  In addressing a claimed violation of that right, we apply the four-factor balancing test articulated by the Supreme Court in *Barker v. Wingo*, 407 U.S. 514 (1972), "in which the conduct of both the prosecution and the defendant are weighed."  *Kanneh*, 403 Md. at 687-88 (quoting *Barker*, 407 U.S. at 530); *Glover v. State*, 368 Md. 211, 221 (2002).

Those factors are:  (1) the "[l]ength of delay"; (2) the "reason for the delay"; the "defendant's assertion of" his speedy trial right; and (4) "prejudice to the defendant." *Barker*, 407 U.S. at 530.  None of these factors is, in itself, either necessary or sufficient to

find a violation of the speedy trial right; instead, "they are related factors and must be considered together with such other circumstances as may be relevant." *Id.* at 533. But, before we apply the four-factor test, we must first determine whether the delay was of sufficient length to be deemed "presumptively prejudicial," because, unless "there is some delay which is presumptively prejudicial, there is no necessity for inquiry into the other factors that go into the balance." *Id.* at 530.

In determining whether there was a sufficient delay to trigger a constitutional speedy trial analysis, we must first ascertain the parameters of the time in question—the starting point and ending point. Ordinarily, in a case in which there was a retrial following the declaration of a mistrial, the starting point for computing the length of delay begins at the time when the mistrial was declared, and the relevant time period runs until the commencement of the retrial. *Icgoren v. State*, 103 Md. App. 407, 420 (1995). That determination is changed, however, by the fact that, three days before the scheduled retrial, the State entered a *nolle prosequi* to the original charging document and, one week later, filed a new indictment. The Maryland rule in such case is that, so long as the State acted in good faith, the *nolle prosequi* terminates the original prosecution, and the speedy trial clock starts anew from the date of the filing of the new charging document. *See State v. Henson*, 335 Md. 326, 336-38 (1994); *accord Clark v. State*, 97 Md. App. 381, 393-94 (1993) ("If the prior termination of charges is done in good faith, we start the speedy trial clock at the second indictment.") (footnote omitted).

The State presented this very argument[9] at the February 14, 2014 motions hearing, citing *Clark* and *United States v. MacDonald*, 456 U.S. 1 (1982),[10] in support, specifically pointing out that prosecutorial good faith "can include changes to a charging document." At the conclusion of argument, the circuit court denied Nottingham's motion to dismiss without articulating specific grounds, stating merely, "I find there's no violation."

Although the motions court did not articulate the basis of its ruling, it appears that it adopted the State's argument, as it did not engage in the *Barker* four-factor balancing test. In this respect, the instant case is distinguishable from *Henson*, where the trial court likewise did not engage in the balancing test, *Henson*, 335 Md. at 332, but where, because the "State's good faith in dismissing the charges . . . was neither presented to, nor decided by, the motions court," *id.* at 339, it was necessary to remand so that the circuit court could make findings as to whether the State had acted in good faith and whether Henson's speedy trial right had been violated, once the relevant time period had been determined. *Id.* at 340.

---

[9]Inexplicably, the State does not raise this contention in its brief. We may, however, affirm a judgment on any ground apparent from the record, especially given that this issue was raised in and, as we explain, decided by the court below. *See*, *e.g.*, *State v. Phillips*, 210 Md. App. 239, 270 (2013).

[10]*United States v. MacDonald*, 456 U.S. 1, 7 (1982), held that "the Speedy Trial Clause has no application after the Government, acting in good faith, formally drops charges." That decision did not directly address whether the time from a defendant's initial arrest until the dismissal of charges should be counted in a speedy trial claim raised after a new indictment is issued. In *State v. Henson*, 335 Md. 326, 338 (1994), the Court of Appeals interpreted *MacDonald* to hold that "the period preceding the earlier dismissal is not counted in the speedy trial analysis."

Here, in contrast, given that the State's argument focused almost exclusively on good faith, and given the presumption that, "absent a misstatement of law or conduct inconsistent with the law, a trial judge is presumed to know the law and apply it properly," we conclude that the motions court found, as a fact, that the State acted in good faith in entering a *nolle prosequi* to the original indictment and, one week later, returning a new indictment. *Medley v. State*, 386 Md. 3, 7 (2005) (brackets omitted) (citation and quotation omitted); *see also Morris v. State*, 153 Md. App. 480, 489-90 (2003) (observing that, where motions court merely announces its ruling, "without announcing any findings of fact," appellate court "will resolve ambiguities and draw inferences in favor of the prevailing party and against the losing party"). Because, given that implicit finding, the speedy trial clock began on December 17, 2013, the date when the new indictment was filed, the motions court was obviously correct in denying, on February 14, 2014, Nottingham's motion for speedy trial, as it is clear that a two-month delay falls well short of triggering the *Barker* analysis. *See, e.g.*, *Doggett v. United States*, 505 U.S. 647, 652 n.1 (observing that, generally, a delay triggers a speedy trial analysis "at least as it approaches one year"); *Divver v. State*, 356 Md. 379, 389-90 (1999) (observing that delay as brief as eight months could trigger constitutional speedy trial analysis); *State v. Ruben*, 127 Md. App. 430, 440 (1999) (observing that "delay of nearly 11 months from arrest to trial was of constitutional dimension, albeit barely so"); *Icgoren*, *supra*, 103 Md. App. at 423 (delay of eleven months and thirteen days "barely" of

constitutional dimension); *Howard v. State*, 66 Md. App. 273, 291 (1986) (delay of eight

months and 26 days of constitutional dimension).[11]

> **JUDGMENT OF THE CIRCUIT COURT FOR WORCESTER COUNTY REVERSED AS TO AFFRAY CHARGE; ALL OTHER JUDGMENTS OF CONVICTION AFFIRMED. CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS ASSESSED ONE HALF TO WORCESTER COUNTY AND ONE HALF TO APPELLANT.**

---

[11]Although it obviously could not have been error for the circuit court to have begun trial, on June 16, 2014, that is, six months after the new indictment was filed, given that Nottingham did not renew his speedy trial motion at that time, we further note that the Court of Appeals observed, in *State v. Gee*, 298 Md. 565, 578 (1984), that it was "not aware of an opinion of the Supreme Court of the United States or of the appellate courts of this State which holds that a delay of six months is of constitutional dimension." Indeed, it could even be argued that Nottingham affirmatively waived his speedy trial claim when, at the beginning of the retrial, the court asked: "And to the extent any procedural things didn't go right in order, do you waive that?" To which defense counsel replied, "We do, Your Honor." As the State does not contend that Nottingham thereby waived his speedy trial claim, we shall not rely upon this ground in affirming the circuit court's denial of it.